1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSHDY ATTIA, | ) 1:06-cv-00778-SMS |
| Plaintiff, | ) DECISION AND ORDER GRANTING |
| v. | ) PLAINTIFF'S SOCIAL SECURITY |
| | ) COMPLAINT (DOC. 1) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social | ) ORDER REMANDING THE MATTER TO THE |
| Security, | ) COMMISSIONER FOR AWARD OF |
| | ) BENEFITS TO PLAINTIFF |
| Defendant. | ) |
| | ) |
| | ) |

Plaintiff is proceeding with counsel and is seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying an application for benefits. Pursuant to 28 U.S.C. § 636(c), both parties have consented to the Magistrate's jurisdiction to conduct all proceedings, including ordering the entry of judgment. On October 6, 2006, District Judge Anthony W. Ishii reassigned the case for all purposes to the undersigned Magistrate Judge. The matter is currently before the Court on the parties' briefs, which have been submitted without oral argument.

## PROCEDURAL HISTORY

On June 18, 2001, Plaintiff filed an application for SSI

1

benefits under Title XVI of the Act and an application for DIB benefits under Title II of the Act, respectively, alleging disability beginning on May 25, 2001, due to heart problems and high blood sugar. (A.R. 49-51, 76.) Plaintiff later alleged fatigue and stomach problems. (Id. at 36.) Plaintiff's claim of disability was denied initially and on reconsideration. (Id. at 30-33, 36-40.)

Pursuant to Plaintiff's request for a hearing, on April 23, 2003, Plaintiff appeared with an attorney and testified before an administrative law judge (ALJ), William C. Thompson, Jr. (A.R. at 488-515.) The ALJ denied Plaintiff's application for benefits in a decision dated June 27, 2003. (Id. at 330-36.) Pursuant to Plaintiff's request for review (A.R. 340-42), the Appeals Council ordered the case remanded for clarification of Plaintiff's substantial gainful activity through 2002; reconsideration of an inadequate rejection of a treating physician's opinion; an explanation of the reasons, including a function-by-function assessment, of Plaintiff's ability to perform work-related physical and mental activities in connection with the RFC found by the ALJ; and an evaluation of subjective complaints that was consistent with regulations and rulings. The Appeals Council directed further consideration of the treating, examining, and nonexamining source opinions and an explanation of the weight given to each opinion; further evaluation of subjective complaints and rationales therefor; evaluation of Plaintiff's mental impairment and any necessary clarification and completion of the record; further consideration and statement of rationale for the RFC with specific references to evidence of record in

1 support of the assessed limitations; and obtaining supplemental

2 evidence from a vocational expert (VE) to clarify the effect of

3 assessed limitations on the occupational base to reflect the

4 specific capacity/limitations established by the record as a

5 whole, including adequate hypothetical questions, identification

6 of jobs, and identification and resolution of any conflicts

7 between the VE's evidence and information in the <u>Dictionary of

8 Occupational Titles</u>. (<u>Id.</u> pp. 344-46.)

9     Plaintiff, counsel, and a VE appeared for a post-remand

10 hearing on November 20, 2005. (A.R. 516-49.) In a decision dated

11 January 21, 2006, the ALJ concluded that Plaintiff was not

12 disabled. (A.R. 17-25.) The Appeals Council denied Plaintiff's

13 request for review on May 24, 2006. (A.R. 7-10.)

14     Plaintiff filed the complaint in this action on June 17,

15 2006. The record was lodged on September 22, 2006. Briefing began

16 on November 30, 2006, with the filing of Plaintiff's opening

17 brief; Defendant filed a brief in opposition on December 21,

18 2006; and Plaintiff filed a reply brief on January 1, 2007.

19                SCOPE AND STANDARD OF REVIEW

20     Congress has provided a limited scope of judicial review of

21 the Commissioner's decision to deny benefits under the Act. In

22 reviewing findings of fact with respect to such determinations,

23 the Court must determine whether the decision of the Commissioner

24 is supported by substantial evidence. 42 U.S.C. § 405(g).

25 Substantial evidence means "more than a mere scintilla,"

26 <u>Richardson v. Perales</u>, 402 U.S. 389, 402 (1971), but less than a

27 preponderance, <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119, n. 10

28 (9th Cir. 1975). It is "such relevant evidence as a reasonable

1 mind might accept as adequate to support a conclusion."

2 _Richardson_, 402 U.S. at 401. The Court must consider the record

3 as a whole, weighing both the evidence that supports and the

4 evidence that detracts from the Commissioner's conclusion; it may

5 not simply isolate a portion of evidence that supports the

6 decision. _Jones v. Heckler_, 760 F.2d 993, 995 (9th Cir. 1985).

7 It is immaterial that the evidence would support a finding

8 contrary to that reached by the Commissioner; the determination

9 of the Commissioner as to a factual matter will stand if

10 supported by substantial evidence because it is the

11 Commissioner's job, and not the Court's, to resolve conflicts in

12 the evidence. _Sorenson v. Weinberger_, 514 F.2d 1112, 1119 (9th

13 Cir. 1975).

14      In weighing the evidence and making findings, the

15 Commissioner must apply the proper legal standards. _Burkhart v._

16 _Bowen_, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must

17 review the whole record and uphold the Commissioner's

18 determination that the claimant is not disabled if the

19 Commissioner applied the proper legal standards, and if the

20 Commissioner's findings are supported by substantial evidence.

21 _See,_ _Sanchez v. Secretary of Health and Human Services_, 812 F.2d

22 509, 510 (9th Cir. 1987); _Jones v. Heckler_, 760 F.2d at 995. If

23 the Court concludes that the ALJ did not use the proper legal

24 standard, the matter will be remanded to permit application of

25 the appropriate standard. _Cooper v. Bowen_, 885 F.2d 557, 561 (9th

26 Cir. 1987).

27 ////

28 //////

DISCUSSION

I. Disability

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that the claimant is not only unable to do the claimant's previous work, but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. 1382c(a)(3)(B); Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden of establishing a disability is initially on the claimant, who must prove that the claimant is unable to return to his or her former type of work; the burden then shifts to the Commissioner to identify other jobs that the claimant is capable of performing considering the claimant's residual functional capacity, as well as her age, education and last fifteen years of work experience. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The regulations provide that the ALJ must make specific sequential determinations in the process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity since the alleged date of the onset of the impairment, 20 C.F.R. § 404.1520 (2006);[1] 2) whether solely on the

---

[1] All references are to the 2006 version of the Code of Federal Regulations unless otherwise stated.

basis of the medical evidence the claimed impairment is severe, that is, of a magnitude sufficient to limit significantly the individual's physical or mental ability to do basic work activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the basis of medical evidence the impairment equals or exceeds in severity certain impairments described in Appendix I of the regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant has sufficient residual functional capacity, defined as what an individual can still do despite limitations, to perform the applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and 5) whether on the basis of the applicant's age, education, work experience, and residual functional capacity, the applicant can perform any other gainful and substantial work within the economy, 20 C.F.R. § 404.1520(f).

With respect to SSI, the five-step evaluation process is essentially the same. See 20 C.F.R. § 416.920.

Here, the ALJ concluded that Plaintiff had engaged in substantial gainful activity until at least May 19, 2002; his severe impairments of coronary artery disease, posttraumatic stress disorder, and diabetes without organ damage or neuropathy did not meet or medically equal a listed impairment and permitted Plaintiff to lift and carry fifty pounds occasionally and twenty-five pounds frequently; stand or walk for at least six hours in combination in an eight-hour workday, and sit without limit when not required to stand or walk; but not to climb ladders or work at heights. Plaintiff was better suited for jobs requiring relatively simple instructions and relatively restricted contact with the public and coworkers such that he could work in the

presence of others but should not be a part of a work team or a cooperative work process. (A.R. 24.)

II. <u>Rejection of Plaintiff's Subjective Complaints</u>

A. <u>Coronary Symptoms</u>

Plaintiff argues that in determining Plaintiff's RFC, the ALJ failed to provide clear and convincing reasons for rejecting Plaintiff's testimony regarding the severity of his symptoms, including increasing chest pain and resulting limitations, such as difficulty climbing, lifting, and standing for thirty minutes, requiring stopping and resting for two hours; shortness of breath, sweating, and heart pain requiring sitting and resting after walking two blocks; lower back and body discomfort due to standing; sharp pain upon bending; weakness and severe pain in the upper arm and chest upon lifting more than ten pounds; chest pain that worsened with prolonged standing; and fatigue and resulting limitations, including having to lie down to watch television, inability to do any cooking and shopping, and having to rest when driving. (A.R. 499, 504, 506, 525, 526-32, 533-37.) Plaintiff had visited the emergency room once two months before the second hearing for pain in his chest and left arm that was like what happened when he had his heart attack. (A.R. 531.)

The court in <u>Orn v. Astrue</u>, - F.3d -, 2007 WL 2034287, *5 (9th Cir. 2007), summarized the pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's subjective complaints:

> An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. See <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir.1989). However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ

must provide " 'specific, cogent reasons for the disbelief.' " Morgan, 169 F.3d at 599 (quoting Lester, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." Id. Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." Id.

Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. See S.S.R. 02-1p (Cum. Ed.2002), available at Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity, 67 Fed.Reg. 57,859-02 (Sept. 12, 2002); S.S.R. 96-7p (Cum. Ed.1996), available at 61 Fed.Reg. 34,483-01 (July 2, 1996). An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. See 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); see Daniels v. Apfel, 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." Fair, 885 F.2d at 603; see also Thomas, 278 F.3d at 958-59.

The factors to be considered in weighing credibility include the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the symptoms; treatment, other than medication, the person receives or has received for relief of the symptoms; any measures other than treatment the claimant uses or has used to relieve the symptoms; and any other factors concerning the claimant's

1  functional limitations and restrictions due to pain or other
2  symptoms. 20 C.F.R. §§ 404.1529, 416.929; S.S.R. 96-7p.

3      With respect to the course of analysis directed by the
4  regulations, the ALJ is first obligated to consider all symptoms
5  and the extent to which the symptoms can reasonably be accepted
6  as consistent with the objective medical evidence and other
7  evidence. 20 C.F.R. §§ 404.1529(a), 416.929(a). Once it is
8  determined that there is a medically determinable impairment that
9  could reasonably be expected to produce the claimant's symptoms,
10 the ALJ must then evaluate the intensity and persistence of the
11 symptoms to determine how the symptoms limit the capacity for
12 work. §§ 404.1529(b), (c); 416.929(b), (c). The ALJ will consider
13 all available evidence. To the extent that the claimant's
14 symptoms can be reasonably accepted as consistent with the
15 objective medical evidence and other evidence, the symptoms will
16 be determined to diminish the claimant's capacity for basic work
17 activities. §§ 404.1529(c)(4); 416.929(c)(4). A claimant's
18 statements will not be rejected solely because unsubstantiated by
19 the available objective medical evidence. §§ 404.1529(c)(2);
20 416.929(c)(2).

21     Further, the relevant Social Security Ruling provides in
22 pertinent part that an ALJ has an obligation to articulate the
23 reasons supporting the analysis:

24         When evaluating the credibility of an individual's
           statements, the adjudicator must consider the entire
25         case record and give specific reasons for the weight
           given to the individual's statements.
26
27         The finding on the credibility of the individual's
           statements cannot be based on an intangible or
           intuitive notion about an individual's credibility. The
28         reasons for the credibility finding must be grounded in

the evidence and articulated in the determination or
decision. It is not sufficient to make a conclusory
statement that "the individual's allegations have been
considered" or that "the allegations are (or are not)
credible." It is also not enough for the adjudicator
simply to recite the factors that are described in the
regulations for evaluating symptoms. The determination
or decision must contain specific reasons for the
finding on credibility, supported by the evidence in
the case record, and must be sufficiently specific to
make clear to the individual and to any subsequent
reviewers the weight the adjudicator gave to the
individual's statements and the reasons for that
weight. This documentation is necessary in order to
give the individual a full and fair review of his or
her claim, and in order to ensure a well-reasoned
determination or decision.

S.S.R. 96-7p at 4.

Here, the ALJ assessed Plaintiff's subjective symptoms in

the context of determining Plaintiff's RFC despite his combined

impairments, including coronary artery disease, posttraumatic

stress disorder, and diabetes without organ damage or neuropathy.

(A.R. 19-22.) The ALJ concluded:

The claimant's statements concerning his impairments
and their continued impact on his ability to work
are not entirely credible in light of discrepancies
between the claimant's assertions and information
contained in the documentary reports and the reports
of the treating and examining practitioners, which show
that he is doing quite well following his heart
surgery and that his diabetes is well controlled
on the whole.

(A.R. 22.)

The objective medical evidence concerning Plaintiff's

coronary artery disease that was reviewed by the ALJ, as

articulated in the decision, included records predating May 20,

2002, which showed that Plaintiff became disabled first on May

25, 2001, when he received emergency room treatment for a heart

attack, then underwent heart surgery, was doing well one month

later, returned to his old job, and worked until May 19, 2002.

1  (A.R. 18-20.) The ALJ found that Plaintiff was not disabled at

2  step one, or was able to perform substantial gainful work, until

3  May 19, 2002. (A.R. 18.) The ALJ noted that shortly after

4  Plaintiff stopped work in May 2002, records showed that he was

5  not taking the proper medication, but it had been adjusted. (A.R.

6  20.) The record referred to (A.R. 229, Ex. 10F/6) was a progress

7  note from May 29, 2002, that is partially illegible. The ALJ's

8  reference to this note occurred in the ALJ's analysis of

9  Plaintiff's coronary heart disease (see heading, A.R. 19).

10 However, the pertinent portion of the note itself related to

11 Plaintiff's diabetes and not his heart condition. (A.R. 229.)

12 Thus, this reasoning does not appear to be genuinely supportive

13 of a conclusion concerning the status of the record or of

14 Plaintiff's coronary condition.

15      The ALJ referred to a report from Plaintiff one year after

16 his heart surgery, recorded in a letter dated July 26, 2002, from

17 Dr. Hassan Hussain of Stanislaus Cardiology to Dr. Gogna. (A.R.

18 20, 207-09.) Dr. Hussain noted Plaintiff's continued complaints

19 of mild left axillary discomfort, occasionally going to the arm

20 and radiating to the front of the left precordium, not associated

21 with any nausea, vomiting, diaphoresis, or shortness of breath,

22 and dissipating fairly with exercise; he also noted that

23 Plaintiff denied chest pains with exercise. This report is one of

24 fairly mild symptoms. The Court notes, however, that Dr. Hussain

25 noted in the same letter that Plaintiff was "in somewhat of a

26 denial as to the actual event that occurred and does not feel

27 like he may have had significant blockages," and further that

28 Plaintiff was concerned about his continuing chest pain. (A.R.

208.)

The ALJ also referred to medical test results, including a treadmill ECG suggesting ischemia but not significant enough to qualify for the diagnosis (A.R. 20), which occurred on August 27, 2002 (A.R. 202). The result referred to was that the study was "very suggestive" of ischemia but did "not quite qualify" for the diagnosis. (A.R. 202.) The ALJ also referred to an echocardiogram revealing only mild to moderate problems; this test was performed on August 27, 2002. (A.R. 20, 201.)

The other reference to medical reports was to a report from Jonathan Ng, who performed an examination at the request of Plaintiff's counsel on January 22, 2004, which appeared to be concerned with whether Plaintiff's work was a causative factor in his coronary disease. Dr. Ng opined that Plaintiff continued to have angina despite his surgery, apical akinesis, and ongoing ischemia; he noted that subjectively, Plaintiff had chest pain that lasted about half an hour happening about three to four times a week. (A.R. 406, 388-407.) However, the Court notes that Dr. Ng's report also reflected that Plaintiff had a lot of continuing chest pain after his surgery and stopped working after one year; about one year before (i.e., thus approximately January 2003), Plaintiff had testing because of persistent chest pain, and was told to have a coronary angiogram, but was too afraid and had not consented to it. (A.R. 391.) Ng also reported that in terms of current symptoms, Plaintiff had a lot of chest pain, not predicably associated with exertion. (Id.) Further, Ng recounted Hussain's medical records, including a record on July 26, 2002, to the effect that Plaintiff continued to have some chest pain.

1  (A.R. 394.)

2      Other records, not mentioned by the ALJ, also reflect a

3  different set of chest symptoms. Plaintiff reported almost

4  constant chest pain in December 2003 (qualified medical exam).

5  The report of Dr. Nicholas Aboughannam, who was certified in

6  internal medicine, summarizes a comprehensive internal medicine

7  evaluation upon examination of Plaintiff on October 28, 2004.

8  (A.R. 382-86.) Plaintiff reported that he had chest pain in May

9  2001 and three-vessel coronary artery bypass surgery in June

10  2001; since then Plaintiff had "been having chest pains on and

11  off and now they are on a daily basis." (A.R. 382.) Plaintiff

12  reported that the chest pain was on the left side, radiated to

13  the left arm, and usually lasted for one to two hours; it would

14  precipitate use of nitroglycerin, which did not resolve the pain,

15  which could last for about thirty to forty-five minutes after

16  that. (Id.) His pain increased with deep breathing and on walking

17  or any physical activity; he also sometimes had sweating and

18  palpations with chest pain; Plaintiff reported that his

19  cardiologist was planning to do an angiogram on him to assess the

20  disease. (Id.)

21      A questionnaire completed by treating cardiologist Dr.

22  Ashraf regarding Plaintiff's RFC, dated September 6 or 16, 2005

23  (A.R. 481-85), reveals that Plaintiff's symptoms included chest

24  pain, shortness of breath, and fatigue; Ashraf noted exertional

25  chest pain that radiated into the left arm; his patient was not a

26  malingerer. He indicated that Plaintiff had a marked limitation

27  of physical activity as demonstrated by fatigue, palpitation,

28  dyspnea, or anginal discomfort on ordinary physical activity even

1  though comfortable at rest. He noted that Plaintiff's experience

2  of cardiac symptoms was often severe enough to interfere with

3  attention and concentration. (A.R. 481-82, 481-84.)

4      The ALJ seemed to recognize that some deterioration in

5  Plaintiff's coronary condition had occurred because he expressly

6  gave less weight to the medical records before May 20, 2002,

7  because Plaintiff was able to work despite his heart and

8  psychiatric condition before that date. (A.R. 21.)

9      In rejecting Plaintiff's credibility regarding his coronary

10  condition, the ALJ focused on inconsistencies between Plaintiff's

11  assertions and information contained in the medical record, which

12  he concluded showed that Plaintiff was doing quite well following

13  his heart surgery. (A.R. 22.) Insofar as the ALJ relied on

14  inconsistency between Plaintiff's complaints at the hearings and

15  information contained in the medical records, the reason does not

16  have substantial support in the record and cannot be said to have

17  clear and convincing force. The record shows a continuing

18  experience of chest pain that worsened over time. The ALJ's

19  reasoning disregarded or failed to address the clear indication

20  of a worsening situation. This is contrary to S.S.R. 96-7p, which

21  states in pertinent part:

22      However, the lack of consistency between an
        individual's statements and other statements that
23      he or she has made at other times does not necessarily
        mean that the individual's statements are not credible.
24      Symptoms may vary in their intensity, persistence, and
        functional effects, or may worsen or improve with time,
25      and this may explain why the individual does not always
        allege the same intensity, persistence, or functional
26      effects of his or her symptoms. Therefore, the adjudicator
        will need to review the case record to determine
27      whether there are any explanations for any variations
        in the individual's statements about symptoms and their
28      effects.

1  S.S.R. 96-7p at 5. See also Stone v. Heckler, 761 F.2d 530, 532
2  (9th Cir. 1985) (concerning an ALJ's unexplained failure to
3  consider recent medical evidence that indicated a degenerative
4  process that was progressively deteriorating, and noting that the
5  most recent medical report is the most probative in such
6  circumstances). The Social Security Ruling makes it clear that a
7  longitudinal medical record of the course of symptoms over time,
8  or of any treatment and its success or failure, is important
9  information. (S.S.R. 96-7p, p. 6.) In general, a longitudinal
10 medical record demonstrating an individual's attempts to seek
11 medical treatment for symptoms and to follow that treatment once
12 prescribed lends support to the allegations of symptoms. (Id. pp.
13 6-7.)

14      Accordingly, the Court concludes that the ALJ's reasons for
15 rejecting Plaintiff's complaints concerning chest pain and
16 limitations associated with coronary disease were not supported
17 by clear and convincing reasons supported by substantial evidence
18 in the record.

19             B. Fatigue

20      With respect to rejection of Plaintiff's complaints of
21 fatigue and resulting limitations, including having to lie down
22 to watch television, inability to do any cooking and shopping,
23 and having to rest when driving, Plaintiff argues that the ALJ's
24 reasoning was insufficient because the medical records reveal
25 treatment for hepatitis C.

26      Plaintiff testified that he had fatigue from his hepatitis
27 C; his body did not accept the Interferon therapy, which he had
28 for six months from Dr. Absood. (A.R. 533-37.)

1    The ALJ stated:

2    **Hepatitis**

3    _____The claimant has also received interferon therapy
     for his hepatitis C. At the time of his treatment,
4    he felt tired (Exhibit 22F/17). There is no indication
     that his therapy lasted one year. His treating doctor,
5    Youhana Jacobs, noted that he was not comfortable
     giving him one year off of work even after considering
6    the claimant's combination of impairments (Exhibit 8F/3).

7    (A.R. 20.)

8    Plaintiff refers to an on-line version of the <u>Merck Manual</u>

9    <u>of Diagnosis and Therapy</u>, which identifies anorexia, fatigue, and

10   weakness as common symptoms of liver dysfunction and of hepatitis

11   C, to support his argument. However, it does not appear that

12   these materials were before the ALJ. The decision of an ALJ must

13   be based on the evidence in the record. 42 U.S.C. § 405(g);

14   <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1341 (9th Cir. 1988). Thus, the

15   medical significance of high ALK phosphate levels in August 2004

16   (A.R. 448) and high hepatitis titer and very high viral RNA load

17   in February 2002 (A.R. 233) with respect to Plaintiff's precise

18   hepatitis symptoms is not established by extra-record sources.

19   Generally the record reflects, however, continued following

20   of his viral load and hepatitis condition. (A.R. 226, September

21   2002; A.R. 453, December 2002; AR. 434-35, January 2003; A.R.

22   432, November 2003; A.R. 428, July 2004; A.R. 424, October 2004.)

23   Specifically, in September 2002, Plaintiff reported to Dr.

24   Castro and/or nurse practitioner Kitchell that he was being

25   treated with Interferon weekly and Ribavirin daily, which left

26   Plaintiff feeling very drawn out and weak such that he could not

27   work. (A.R. 227.) Plaintiff reported to Dr. Castro and/or

28   physician's assistant John Kitchell at the family practice clinic

1  on November 21, 2002, that his Interferon therapy with Dr. Absood
2  was still proceeding, and that Plaintiff would continue with it;
3  it was noted that the regimen "does waste him out, makes him
4  tired and exhausted where he cannot work," and would continue for
5  nine more months. (A.R. 437.)

6      Plaintiff was being treated by Dr. Absood for hepatitis C
7  when on September 5, 2002, internal medicine specialist Youhana
8  Jacobs, M.D., examined Plaintiff.

9      In January 2003, Dr. Castro or physician's assistant
10 Kitchell noted that Plaintiff's liver function test looked very
11 good. (A.R. 434.) In December 2003, Plaintiff complained that he
12 suffered fatigue and poor energy level. (A.R. 364.)

13     In October 2004, Plaintiff reported to Dr. Aboughannam, who
14 conducted an internal medicine examination, that his hepatitis C
15 had been treated with Interferon for six months, but his viral
16 load did not respond, and the last viral load count that he
17 remembered was 13 million. (A.R. 383.) Plaintiff reported extreme
18 fatigue with even light physical activity. (Id.)

19     The ALJ appears to have reasoned that it was solely
20 Plaintiff's Interferon therapy that contributed to his fatigue
21 because he noted that there was no indication that the therapy
22 lasted one year. However, as the preceding summary reveals,
23 Plaintiff continued to complain of fatigue, and his hepatitis C
24 continued to be a medical condition which his doctors followed.

25     Further, the precise negative inference concerning
26 Plaintiff's condition as a result of hepatitis C that was drawn
27 by the ALJ appears to lack clear and convincing force. The ALJ
28 appears to rely on the reluctance of treating physician Dr.

1  Jacobs to declare Plaintiff unable to work for an extended period

2  because of hepatitis C. (A.R. 20.) However, the record reveals

3  that Plaintiff initially saw Dr. Jacobs, who was then a new

4  physician for Plaintiff, in August 2002, and complained of

5  generalized aches, abdominal cramps, and fever, secondary to

6  Ribitol, which Plaintiff was taking for hepatitis C while seeing

7  Dr. Absood. (A.R. 213.) The plan for Plaintiff's hepatitis was

8  for Plaintiff to follow up with Dr. Absood; Dr. Jacobs gave other

9  recommendations for Jacobs' own treatment of Plaintiff's diabetes

10 and coronary disease. (A.R. 214-15.) At a follow-up visit in

11 September 2002, Dr. Jacobs noted Plaintiff's continued treatment

12 with medications with Dr. Absood. (A.R. 211.) Plaintiff had

13 brought disability forms and expressed a desire to be put on

14 disability for one year because of his hepatitis C and treatment

15 therefor. (A.R. 211.) Dr. Jacobs continued to monitor Plaintiff's

16 other conditions; with respect to Plaintiff's hepatitis, he

17 concluded:

18     Hepatitis C. The patient is currently under treatment
    by Dr. Absood. Discussed with the patient disability

19     forms must be filled out by Dr. Absood, since he is treating
    him for the hepatitis C, and I am not comfortable giving

20     him one year off work. He will take the forms to
    Dr. Absood.

21 (A.R. 212.)

22     It was in that context that Dr. Jacobs declined to fill out

23 disability forms concerning Plaintiff's hepatitis. Given the fact

24 that Dr. Jacobs was deferring to Dr. Absood as the physician

25 treating Plaintiff for hepatitis, it is not reasonable to infer

26 from Dr. Jacobs' notes that Jacobs was opining on the nature or

27 severity of Plaintiff's hepatitis or its symptoms. Therefore, the

28

1  ALJ's reasoning for rejecting Plaintiff's credibility concerning
2  his subjective complaints concerning hepatitis is not of clear
3  and convincing force. Although the Court does not find any
4  disability forms filled out by Dr. Absood or anyone else with
5  reference to Plaintiff's hepatitis, this does not serve to revive
6  the ALJ's inadequate reasoning.

7      Accordingly, the Court concludes that the ALJ failed to
8  state clear and convincing reasons for rejecting Plaintiff's
9  credibility in these two respects.

10     The Court notes that the ALJ stated another reason for
11 rejecting Plaintiff's credibility, namely, the perceived
12 inconsistency between Plaintiff's complaints concerning his
13 diabetes and the ALJ's conclusion that Plaintiff's diabetes was
14 well-controlled on the whole. (A.R. 22.) Plaintiff addresses this
15 reason in the course of analysis of the ALJ's treatment of Dr.
16 Aboughannam's opinion, which also related to Plaintiff's
17 diabetes. The Court considers this reason because the Court must
18 determine whether or not other reasons, additional to the
19 discredited ones previously analyzed, were stated by the ALJ that
20 could still constitute clear and convincing reasons for rejecting
21 Plaintiff's credibility.

22     In connection with the ALJ's RFC analysis, the ALJ stated:

23     **Diabetes Mellitus**

24     ____The claimant has diabetes mellitus but does not
       have retinopathy or any documented neuropathy
25     (Exhibit 6F/3). Although his blood sugars vary,
       laboratory testing showed that the claimant's blood
26     sugar over time is only slightly higher than the goal
       for diabetics and well under the range that would
27     suggest a change of treatment (Exhibit 22F/26).

28     The blood sugar test result relied upon by the ALJ was

reported October 22, 2004, and it revealed a blood sugar level of 157, with a normal, non-diabetic range being from 70 to 115. (A.R. 446.) The hemoglobin A1c reading was 7.3, which was high; the glycohemoglobin A1c[2] reference ranges were nondiabetic, less than 6; goal, 7; additional action suggested, over 8. (Id.) The result itself expressly and specifically stated that factors such as duration of diabetes, adherence to therapy, and patient age should be considered in assessing blood glucose control; additional action suggested depended on individual patient circumstances and should be interpreted with respect to the complete patient presentation. (A.R. 446.) Thus, it does not appear that the ALJ had the requisite expertise to interpret the results with respect to whether or not additional action was suggested.

Defendant notes the report of Dr. Castro or of physician's assistant Kitchell dated November 21, 2002, in which it was stated that during a diabetes follow-up visit Plaintiff's blood sugars were still "not perfectly controlled"; Plaintiff was up in the "200 range" then, and his blood sugar for the last three months reflected a hemoglobin A1c of 7.5; the laboratory work showed that he "is probably doing okay so far as control although he could be under a lot better control." (A.R. 437.) The remainder of that report shows that the doctor ordered adjustments and additions of medications, as well as follow-up blood work, in order to get his blood sugars down below the "140

---

[2] "Glycohemoglobin" is a glycosylated hemoglobin, and "hemoglobin A1c" is glycosylated hemoglobin A, a substance the levels of which are increased in poorly controlled diabetics. Dorland's Illustrated Medical Dictionary, (28th ed. 1994), pp. 707, 749.

range in the morning and preferably even lower." The doctor
ordered Plaintiff's paperwork filled out and that he be kept off
work at least through February, to be renewed at that time. (A.R.
437.) This record as a whole is not reasonably interpreted as
showing blood sugar levels that were satisfactorily controlled or
did not merit any modification of treatment.

Reference to the remainder of the record shows that
Plaintiff continuously suffered problems with control of his
blood sugar. (A.R. 232 [hemoglobin A1c of 8.5 in March 2002];
A.R. 213 [Dr. Jacobs noted in August 2002 that his blood sugars
were not well controlled at between 180 to 215]; A.R. 211 [in
September 2002, Dr. Jacobs recited history of diabetes since 1992
and noted blood sugars at home running 171, 209, 140, 179, 233,
239]; A.R. 227 [in September 2002, Dr. Castro/physician's
assistant Kitchell noted blood sugar rarely 170 or below the 150
range, above that most of the time, and varying from low 200's to
300's]; A.R. 455 [high HGBA1C at 7.4 in December 2002]; A.R. 445
[diabetes flow sheet revealing HBA1C of 7.4 in 2003]; A.R. 428
[in July 2004, Dr. Morris/physician's assistant Kitchell reported
sugars were high at 329, last hemoglobin A1c was 7.4, sugars that
morning at home were 180, multiple medications, likely insulin
resistance, and diabetes history since 1992 noted]; A.R. 427
[poor control, adjustment of medications noted in August 2004];
A.R. 447-48 [HgbA1c 8.3, serum glucose high at 182 in August
2004]; A.R. 426 [terrible control with sugars in ranges of 180 to
220, hemoglobin A1c of 8.3, and adjustment of medications noted
on August 30, 2004]; A.R. 424 [better control on October 29,
2004, with hemoglobin A1c starting to come down at 7.3, and a

1  report that Plaintiff's morning sugars between breakfast and
2  lunch were always higher than what they should be]; A.R. 445
3  [diabetes flow sheet revealing HBA1C in May 2005 of 7.3].

4      Specifically, in August 2004 his treating source noted that
5  his diabetes was poorly controlled with blood sugars up in the
6  range of 180 to 220. (A.R. 426.) His treating source did note
7  improved control at 7.3 at the end of October 2004; however, it
8  appears that the claimant stopped taking the Actos, which the
9  doctor had prescribed at the end of August and which the doctor
10 stated improved his values. (A.R. 426, 424.) Plaintiff's doctor
11 characterized the hemoglobin A1c reading of 7.3 as "now starting
12 to come down with better control at 7.3." (A.R. 424.) However, he
13 also clearly characterized blood sugar readings in a range of 180
14 to 220 as "terrible control," and hemoglobin A1c readings of 8.3
15 as still poorly controlled. (A.R. 426.) On October 28, 2004,
16 consulting internal medicine examiner Dr. Aboughannam
17 characterized the blood sugar levels of 330 and 220,
18 respectively, that Plaintiff had recorded that day and the past
19 day, as "radical" and "not well controlled." (A.R. 382.) It
20 appears from the May 2005 reading that Plaintiff's documented
21 history was one which did not progress beyond that point.

22     The Court finds that although a lack of complications from
23 diabetes, such as a lack of retinopathy and of documented
24 neuropathy, would tend to show that the diabetes had not
25 progressed to the point of those complications, it is not shown
26 to be a medically reliable indicator of the value of subjective
27 complaints concerning weakness, lightheadedness, and inability to
28 concentrate that Plaintiff testified that he experienced eight or

1  nine times a month in connection with bad blood sugar levels.

2      As to whether or not a change of treatment was required, the

3  Court reiterates that even with respect to the result relied upon

4  by the ALJ, the result itself states that a determination of

5  whether or not action was needed in any case was dependent upon a

6  variety of factors. It does not appear that the ALJ is competent

7  to substitute his own opinion for findings and conclusions of a

8  physician. See, Marcia v. Sullivan, 900 F.2d 172, 177 n. 6 (9th

9  Cir. 1990).

10     In light of the characterizations of his treating physicians

11 of the poor control of blood sugar that was observed over a

12 lengthy period of time without documentation of significant

13 improvement, the Court concludes that the ALJ's reasoning for

14 rejecting Plaintiff's complaints about his diabetes was not

15 supported by substantial evidence and was not clear and

16 convincing. The ALJ's conclusion that Plaintiff's blood sugar

17 level over time was only slightly higher than a goal, and did not

18 suggest a need for change of treatment, is not supported by the

19 record or by the opinion of a medical expert. Plaintiff's

20 treating physicians continued to be concerned with Plaintiff's

21 levels of blood sugar, and they adjusted and readjusted

22 Plaintiff's diabetes medications in connection with Plaintiff's

23 overall health picture which included multiple medications,

24 concerns with insulin resistance, and continued control issues.

25 Plaintiff's blood sugar levels continued to fluctuate and to

26 reflect poor control. It was only by relying on an isolated

27 portion of the record that the ALJ was able to conclude that

28 Plaintiff's blood sugar was only slightly high and did not

23

1 require a change in treatment.

2    III. <u>Side-Effects of Medication</u>

3    Plaintiff argues that the ALJ failed to state clear and
4 convincing reasons for rejecting Plaintiff's complaints of side-
5 effects of medication. Plaintiff testified that he took all the
6 medications that his doctors prescribed. Further, his side
7 effects were fatigue, irritation, sores in his mouth, and aching
8 muscles. (A.R. 534.)

9    Lay testimony of symptoms must be considered and included in
10 a hypothetical question to an expert or must be rejected with a
11 statement of legitimate reasons. <u>Nguyen v. Chater</u>, 100 F.3d 1462,
12 1467 (9th Cir. 1996). Here, the ALJ did not reject Plaintiff's
13 complaints of fatigue, irritation, and aching muscles, which
14 could have arguably affected his ability to do work on a
15 sustained and regular basis.

16    Further, all of Plaintiff's claimed side-effects from
17 medication were not propounded by the ALJ to the VE with respect
18 to available jobs, either at the first or second hearings  (A.R.
19 511-14, 539-548), although questions concerning fatigue and
20 limitations as reported by Plaintiff to his treating physicians
21 resulted in the VE's opinion that no jobs would be available
22 (A.R. 513-514, 543-47).

23    Defendant argues that the ALJ was not required to include
24 the side-effects in the RFC finding because the testimony was
25 subjective testimony, and the ALJ properly rejected it. However,
26 as previously discussed, the ALJ's rejection of Plaintiff's
27 subjective complaints was inadequate. The Court notes that the
28 medical reports are consistent with and supportive of Plaintiff's

1  claims. (A.R. 211 [Dr. Jacobs report of September 2002 reflecting

2  Plaintiff's complaint of ulceration in his mouth from Glyburide];

3  A.R. 426 [Dr. Morris's and Kitchell's record of Avandia causing

4  his mouth to have ulcers].)

5      IV. <u>Opinions of Treating Physicians</u>

6      Plaintiff argues that the ALJ failed to give adequate

7  reasons, which Plaintiff asserts had to be clear and convincing,

8  for rejecting the opinions of treating physicians. Defendant

9  contends that the ALJ's reasons were sufficient.

10     The pertinent law has recently been summarized:

11         The opinions of treating doctors should be given
       more weight than the opinions of doctors who do not
12     treat the claimant. <u>Lester [v. Chater</u>, 81 F.3d 821, 830
       (9th Cir.1995) (as amended).] Where the treating
13     doctor's opinion is not contradicted by another doctor,
       it may be rejected only for "clear and convincing"
14     reasons supported by substantial evidence in the
       record. <u>Id.</u> (internal quotation marks omitted). Even if
15     the treating doctor's opinion is contradicted by
       another doctor, the ALJ may not reject this opinion
16     without providing "specific and legitimate reasons"
       supported by substantial evidence in the record. <u>Id.</u> at
17     830, quoting <u>Murray v. Heckler</u>, 722 F.2d 499, 502 (9th
       Cir.1983). This can be done by setting out a detailed
18     and thorough summary of the facts and conflicting
       clinical evidence, stating his interpretation thereof,
19     and making findings. <u>Magallanes [v. Bowen</u>, 881 F.2d
       747, 751 (9th Cir.1989).] The ALJ must do more than
20     offer his conclusions. He must set forth his own
       interpretations and explain why they, rather than the
21     doctors', are correct. <u>Embrey v. Bowen</u>, 849 F.2d 418,
       421-22 (9th Cir.1988).
22         <u>Reddick v. Chater</u>, 157 F.3d 715, 725 (9th
           Cir.1998); accord <u>Thomas</u>, 278 F.3d at 957;
23         <u>Lester</u>, 81 F.3d at 830-31.

24
   <u>Orn v. Astrue</u>, - F.3d -, 2007 WL 2034287, *5 (9th Cir. 2007).
25
   In <u>Orn</u>, the Court reviewed the pertinent requirements of the
26
   regulations:
27
           By rule, the Social Security Administration favors
28     the opinion of a treating physician over non-treating

                                25

physicians. See 20 C.F.R. § 404.1527. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." Id. § 404.1527(d)(2). If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. Id. § 404.1527(d)(2)(i)-(ii). Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. Id. § 404.1527(d)(1)-(2). Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. Id. § 404.1527(d)(3)-(6).

Orn v. Astrue, - F.3d -, 2007 WL 2034287, *4 (9th Cir. 2007).

### A. Dr. Ashraf, Treating Cardiologist

Here, Dr. Ashraf, Plaintiff's treating cardiologist, opined that Plaintiff's coronary condition caused him to be significantly restricted in his RFC. In December 2002, Dr. Ashraf opined that Plaintiff could lift no more than ten pounds occasionally and could never carry ten pounds or more or lift more than ten pounds; Plaintiff could sit an hour at a time without interruption and sit no more than a total of three hours in an eight-hour workday; he could occasionally engage in simple grasping and fine manipulation; he could never climb, balance,

stoop, crouch, kneel, or crawl; he could occasionally push and pull; he could frequently reach, handle, feel, hear, and speak; and he had to avoid, to an unspecified extent, heights, moving machinery, chemicals, noise, humidity, dust, extremes of temperature, fumes, vibrations, and other unspecified restrictions. (A.R. 280-82.) Reasons for the assessment were stated. (A.R. 279.)

Again on September 6, 2005, Dr. Ashraf completed another form and attached a test result. (A.R. 416-20.) He opined that Plaintiff had marked limitation of physical activity even though comfortable at rest. (A.R. 416.) Plaintiff was incapable of even low-stress jobs; his experience of cardiac symptoms was severe enough to interfere often with his attention and concentration. Plaintiff could sit for two hours at one time before needing to get up; stand thirty minutes before needing to sit down or walk; needed a job that permitted shifting positions at will from sitting, standing, or walking; Plaintiff could rarely lift less than ten pounds, and never lift more; he could never twist, stoop, crouch, or climb ladders or stairs; and Plaintiff had to avoid concentrated exposure to noise, moderate exposure to humidity and fumes, and all exposure to extreme temperatures or wetness. (A.R. 416-19.)

Plaintiff testified that he saw Dr. Ashraf monthly. (A.R. 507.)

Dr. Ashraf's opinion was contradicted by the opinions of various doctors, who assigned a different physical capacity to Plaintiff.

On August 31, 2001, Plaintiff was examined by Tushar R.

1  Modi, M.D., who was certified in internal medicine and performed

2  an SSI evaluation. Plaintiff had back pain and chest pain that

3  worsened upon moderate exertion. Dr. Modi opined that Plaintiff

4  could lift, push, and pull fifty pounds occasionally and twenty-

5  five pounds frequently; stand and/or walk for six to eight hours

6  in a workday and sit for eight hours; and had no communicative,

7  postural, visual, or environmental limitations. (A.R. 186-87.)

8      Non-examining state agency medical consultant Dr. Thien

9  Nguyen opined on September 12, 2001, that due to his coronary

10 condition and diabetes, Plaintiff could lift fifty pounds

11 occasionally, twenty-five pounds frequently, stand or walk, and

12 sit, about six hours in an eight-hour workday, with unlimited

13 pushing and pulling and no other limitations. (A.R. 216-23.)

14     On November 1, 2002, a non-examining state agency physician

15 opined that due to his coronary artery disease, Plaintiff could

16 occasionally lift twenty pounds and frequently ten, stand and/or

17 walk, and sit, about six hours in an eight-hour workday, and

18 engage in unlimited pushing and pulling; frequently balance,

19 occasionally stoop, kneel, crouch, and crawl; occasionally and

20 never climb (the indication is unclear and appears to depend on

21 whether stairs or a ladder or rope are being climbed (A.R. 251));

22 and Plaintiff had no manipulative, visual, communicative, or

23 environmental limitations. (A.R. 249-254.)

24     On November 15, 2003, Randall Epperson, Ph.D., performed a

25 psychological qualified medical examination and diagnosed

26 Plaintiff with post-traumatic stress disorder. (A.R. 361-75.) Dr.

27 Epperson opined that Plaintiff was moderately impaired in his

28 ability to maintain an appropriate work pace, and moderately to

severely impaired with respect to ability to perform complex and
varied tasks, relate to people beyond giving and receiving
instructions, influence people, and accept and carry out
responsibility for direction, control and planning. (A.R. 373-
74.) Dr. Epperson recommended that Plaintiff could not return to
his usual job; Plaintiff required treatment in the form of
medications and therapy, and he needed to be retrained into a job
involving a lower level of stress. (A.R. 374.)

On January 22, 2004, Dr. Jonathan Ng, who was certified in
internal medicine, examined Plaintiff and reviewed his medical
history in the context of whether or not Plaintiff's work was a
causal factor in his coronary disease. (A.R. 388-407.) Dr. Ng
concluded that Plaintiff's coronary atherosclerosis, which
manifested itself as an acute myocardial infarction in May 25,
2001, was the result of Plaintiff's work activities as a
convenience store clerk working the night shift and being
subjected to robberies and assaults. (A.R. 406.) Plaintiff
continued to have angina despite his surgery, with chest pain
lasting about half an hour happening three to four times a week;
Dr. Ng recommended that he not return to his work as a midnight
shift clerk; Plaintiff was limited to light work and no psycho-
emotional stress. (A.R. 406-07.)

Dr. Aboughhannam, who performed a comprehensive internal
medicine evaluation and examination of Plaintiff on October 28,
2004, concluded that based on Plaintiff's coronary artery
disease, diabetes, nephropathy, possible neuropathy, uncontrolled
hypertension, and hepatitis C, Plaintiff could lift and carry
twenty-five pounds frequently and fifty pounds occasionally,

29

1  stand and walk for two hours in an eight-hour workday, and sit
2  without restriction, without any postural, manipulative, visual,
3  or environmental limitations; however, there was significant
4  communicative limitation because of post-traumatic stress
5  disorder and depression related to his previous work. (A.R. 382-
6  86.)

7      Dr. Harsimrat Sandhu, M.D., conducted a comprehensive
8  psychiatric examination and evaluation of Plaintiff on November
9  18, 2004, and concluded that Plaintiff, who suffered post
10 traumatic stress syndrome from his past difficulties in dealing
11 with violent customers as a convenience store clerk, had fair
12 persistence, good pace, concentration that was difficult to
13 assess, and the ability to perform simple, repetitive tasks as
14 well as detailed and complex tasks but would have difficulty in
15 some situations in accepting instructions from supervisors and
16 interacting with coworkers and would have poor ability to work
17 with or near others without being distracted by them; Plaintiff
18 could perform work activities on a consistent basis except for
19 difficulties interacting with African American colleagues or the
20 public. (A.R. 376-81.)

21     Plaintiff relies on two pieces of post-hearing evidence
22 considered by the Appeals Council. The first is a comprehensive
23 psychiatric examination by Ehab Hanna, M.D., undertaken on
24 December 11, 2005, and concluding with a diagnosis of rule out
25 depressive disorder, and recommending testing and additional
26 history from other sources. (A.R. 462-65, 477-80.)

27     The second is a report of impairments from treating
28 cardiologist Dr. Ashraf signed on March 16, 2006, determining

30

1  that because of Plaintiff's coronary artery disease and continued
2  chest pain, Plaintiff could never lift even ten pounds; Plaintiff
3  could sit one hour at a time and a total of two hours in a
4  workday; he could not stand or walk; he could never use his hands
5  for simple grasping or fine manipulation, and could never use his
6  feet, climb, balance, stoop, crouch, kneel, crawl, reach, push,
7  or pull, but could occasionally handle and feel, and could
8  frequently hear and speak. Plaintiff was to avoid all exposure to
9  heights, moving machinery, vibrations, noise, dust and fumes,
10 chemicals, wetness, dryness, and extremes of temperature. With
11 respect to the mental assessment, Dr. Ashraf concluded that
12 Plaintiff had a poor ability to deal with work stress but a fair
13 ability to function independently and maintain attention and
14 concentration. (A.R. 471-75.) The report reflects that Dr. Ashraf
15 had treated Plaintiff since November 2002, and Plaintiff had
16 continued chest pain. (A.R. 471.)

17     The Court may properly consider additional materials that
18 were addressed by the Appeals Council in the context of denying
19 Appellant's request for review. Harman v. Apfel, 211 F.3d 1172,
20 1180 (9th Cir. 2000) (citing Ramirez v. Shalala, 8 F.3d 1449 (9th
21 Cir. 1993)). New and material evidence may be submitted by the
22 Appeals Council, which can evaluate the evidence only where it
23 relates to the period on or before the date of the ALJ's
24 decision. 20 C.F.R. §§ 404.970(b), 416.1470(b). The ALJ's
25 decision was dated January 21, 2006, so the later report of Dr.
26 Ashraf was beyond the period of evaluation.

27     Dr. Ashraf's earlier opinion as to Plaintiff's RFC was
28 contradicted by several other opinions in the record and thus was

inconsistent with other substantial evidence in the case record.
Therefore, the ALJ was not required to give it controlling
weight.

Here, the ALJ stated that he gave very little weight to the
RFC opinion (A.R. 21), but later it is clear that he actually
expressly rejected the treating physician's opinion (A.R. 22).
The ALJ stated:

> I reject this treating source's opinion because
> it is expressed in a checklist without adequate
> explanation of the basis of the conclusions. It
> is unsupported, brief and/or conclusory. I also
> reject this treating source's opinion because it
> is based on properly discounted subjective complaints;
> there are inconsistencies between the opinion and
> clinical and laboratory findings; the physician is
> advocating on the claimant's behalf; there are
> inconsistencies between the opinion and the treatment
> records; the physician's opinion has changed without
> evidence of a change in objective clinical findings
> and there are inconsistencies between the doctor's
> opinion and the claimant's daily activities.

(A.R. 22.)

It is permissible for an ALJ to prefer an opinion supported
by specific clinical findings and an explanation thereof over a
check-off type of form lacking an explanation of the basis for
the conclusions. Crane v. Shalala, 76 F.3d 251, 253 (9th Cir.
1996) (citing Murray v. Heckler, 722 F.2d 499, 501 (9th Cir.
1983)); see Batson v. Commissioner of the Social Security
Administration, 359 F.3d 1190, 1195 (9th Cir. 2004).

The first reason stated by the ALJ here consists of the form
of the opinion and lack of explanation of the basis of the
opinion. Reference to Dr. Ashraf's 2002 opinion shows that Dr.
Ashraf stated a diagnosis, namely, coronary artery disease. (A.R.
279.) He also stated clinical findings, including a blood

1  pressure reading of 145 over 80; however, several of the clinical
2  findings are not legible. (A.R. 279.) The doctor also stated
3  laboratory findings including a stress test suggestive of
4  ischemia. (A.R. 279.) Indications of treatment are likewise
5  illegible. (A.R. 279.) It is true that the doctor did not state
6  medical findings that supported each separately listed limitation
7  of activity; he only listed the findings in the first page, and
8  then generally stated that Plaintiff had coronary artery disease.
9  (A.R. 280-83, 283.) However, as noted, contrary to the ALJ's
10  conclusion, the doctor stated both clinical and laboratory
11  findings.

12      Reference to the 2005 report reveals that the report form,
13  which appears to have been generated by Plaintiff's counsel,
14  requested a diagnosis with New York Heart Association functional
15  classification. (A.R. 416.) Dr. Ashraf listed a diagnosis of
16  angina pectoris FC III, a reference to the New York Heart
17  Association Functional Classification III, which reflects a
18  judgment of marked limitation in activity due to symptoms, even
19  during less-than-ordinary activity; comfortable only at rest.
20  Wikipedia, New York Heart Association Functional Classification.
21  This evaluation of Plaintiff's condition was repeated on the same
22  page. (A.R. 416, item 7.) Again, the clinical findings and
23  laboratory and test results showing the impairments appear to be
24  illegible. (A.R. 416.) Symptoms of chest pain, shortness of
25  breath, and fatigue were noted. (Id.) The pain was described as
26  exertional chest pain radiating into the left arm; one word is
27  illegible. (A.R. 416, item 5.) The doctor indicated that the
28  chest pain was stress-induced. (A.R. 417.) He listed the angina

33

pectoris diagnosis as the reason for Plaintiff's incapacity for even low-stress jobs. He stated that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. He attached a test result, which appears as a graph of a test dated September 6, 2005, and is labeled "Custom Field One, CHEST PAIN." (A.R. 420.) Three short lines of writing by the doctor are illegible.

Thus, although the opinions were on checklist forms, the doctor did explain the basis of his conclusions. Although he did not explain each particular limitation, he grounded his opinion in clinical and laboratory findings as well as the statements of the Plaintiff regarding his symptoms. The ALJ's reasoning in this regard was thus without substantial support in the record.

The ALJ next reasoned that the opinion was based on properly discounted subjective complaints. (A.R. 22.) The Court notes that viewing the whole of the treating doctor's evaluations, it appears that Dr. Ashraf referred to clinical and laboratory findings in his evaluation. However, the symptom of chest pain is a subjectively experienced symptom.

A physical or mental impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(D). Therefore, the fact that an opinion is based primarily on the patient's subjective complaints may be properly considered in evaluating an opinion. Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992). Where a treating source's opinion is based largely on the Plaintiff's own subjective

description of his or her symptoms, and the ALJ has discredited the Plaintiff's claim as to those subjective symptoms, the ALJ may reject the treating source's opinion. <u>Fair v. Bowen</u>, 885 F.2d 597, 605 (9th Cir. 1989).

As previously detailed, the ALJ's credibility findings were not supported, and thus the claimant's subjective complaints were not properly discounted. Thus, the Court finds inadequate the ALJ's stated reason that Dr. Ashraf's opinion was based on properly discounted subjective complaints.

The ALJ relied on inconsistencies between the opinion and clinical and laboratory findings. The ALJ did not identify these findings. Because part of the treating doctor's opinion was illegible, it is not possible to know exactly what the findings were that were relied on by the doctor or whether or not they were inconsistent. Further, as previously noted, to the extent that the ALJ relied on findings from the period just after Plaintiff's surgery, it appears that the ALJ was selecting just one portion of the record and was not considering the deterioration of Plaintiff's condition. Dr. Ashraf's opinion was based in part on ischemia; the record contained a treadmill result that was "very suggestive" of ischemia but did "not quite qualify" for the diagnosis. (A.R. 202.) Dr. Ng also opined that Plaintiff continued to have angina despite his surgery, as well as apical akinesis and ongoing ischemia; Plaintiff could perform only light work and should be precluded from psycho-emotional stress. (A.R. 406.) It does not appear that there is inconsistency with the finding from the treadmill.

The echocardigram of August 2002 showed some readings within

1  normal limits, but it also showed mild thickening of the
2  posterior wall of the interventricular septum and mitral valve
3  leaflets, a slightly hypokinetic interventricular septum, mild
4  mitral regurgitation, mild to moderate tricuspid regurgitation,
5  and an aortic valve that was not very well visualized, but was
6  probably within normal limits (A.R. 201, 203.) It is not clear
7  how this finding may be said to be inconsistent with the doctor's
8  opinion. Further, it is not clear how there is any inconsistency
9  between the test result appended to Dr. Ashraf's 2005 opinion
10 because the result has not been elucidated. Thus, it does not
11 affirmatively appear that there is substantial record support for
12 the ALJ's reasoning.

13     The ALJ stated that there were inconsistencies between Dr.
14 Ashraf's opinion and "the" treatment records. Again, the ALJ did
15 not cite to specific parts of the record or otherwise elucidate
16 this very general reason. In S.S.R. 96-2p, the SSA explained the
17 requirement of stating reasons for the weight given to a treating
18 source's medical opinion. If a determination is not fully
19 favorable or is fully favorable based in part on a treating
20 source's medical opinion, then the decision must contain specific
21 reasons for the weight given to the opinion, supported by the
22 evidence in the case record, and must be sufficiently specific to
23 make clear to any subsequent reviewers the weight the adjudicator
24 gave to the treating source's medical opinion and the reasons for
25 that weight. S.S.R. 96-2p pp. 4-5.

26     The ALJ did not specify which or whose treatment records
27 were being referred to, but the Court will assume that the
28 inconsistency is between Dr. Ashraf's treatment records and his

1 opinion. However, the Court finds no treatment notes per se, as

2 distinct from a report, from Dr. Ashraf in the record. To the

3 extent that his opinion may differ from others' treatment notes,

4 the reason is not adequately articulated to make clear the

5 reasons for the weight given. Other cardiologists' notes appear

6 in the record (A.R. 236-48 [notes and letters of cardiologist W.

7 Richard Smith from August through December 2001]). Smith reported

8 that electrocardiogram and treadmill testing on August 20, 2001,

9 revealed toleration of a moderate level of exercise that was

10 stopped with fatigue and shortness of breath without chest

11 discomfort; the procedure induced ST and T-changes that could be

12 consistent with ischemia or other factors; the

13 electrocardiographic changes came back to baseline immediately

14 after the exercise, which Smith noted was often seen as a false

15 abnormality, but in the strict sense was a positive study. (A.R.

16 246-48.) Smith's consultation report of August 20, 2001,

17 reflected that beginning in May 2001, Plaintiff suffered pain

18 across his chest and into his left arm and back; he suffered a

19 heart attack and had three bypasses; he was hypertensive since

20 1999, and the left arm was numb. In an effort to rule out angina,

21 coronary artery disease, and/or arteriosclerotic cardiovascular

22 disease, Dr. Smith recommended a myocardial perfusion imaging

23 test using exercise stress. (A.R. 247.) On November 15, 2001, a

24 cardiac perfusion scan revealed apical defect, with ischemia of

25 apex a possible consideration. (A.R. 243.) The adenosine-

26 stimulated exercise study was essentially a normal submaximal

27 study. (A.R. 238, 241-42.) However, Dr. Smith noted that the

28 thallium test images suggested a moderate defect involving the

37

left ventricular apex with normalization during rest, findings consistent with ischemia involving the usual destruction of the left anterior descending. Further, there was a moderate defect involving the septum of the left ventricle at both stress and rest, findings consistent with an infarction. He opined that the nuclear medicine cardiac stress study suggested septal wall infarction and apical ischemia. (A.R. 239.) Dr. Smith opined that invasive studies would be required if there was evidence of ischemia. (A.R. 242.) On December 3, 2001, Dr. Smith stated that because of the evidence of ischemia, invasive studies to sort out the coronary artery anatomy were required, including cardiac catheterization and angiography, with possible angioplasty for any lesions. (A.R. 237.) Again, it does not appear that there is any inconsistency between Dr. Ashraf's opinion and these notes, which reflect that cardiological follow-up revealed ischemia and a need for invasive studies. Further, the Court notes that since these studies occurred, Plaintiff's symptoms worsened.

There is also a letter from cardiologist Hassan Hussain dated July 26, 2002, concerning Plaintiff's chest pain that then dissipated with exercise and was not associated with exercise. Dr. Hussain assessed Plaintiff as a person with a known history of coronary artery disease, status post anterior wall myocardial infarction; he recommended an echocardiogram to evaluate the left ventricular and valvular function with medication and additional follow-up. (A.R. 207-09.)

Accordingly, the Court concludes that the ALJ's reasoning with respect to inconsistencies between Dr. Ashraf's opinion and treatment notes was not supported by substantial evidence.

1   The ALJ stated that the physician's opinion had changed
2 without evidence of a change in objective clinical findings.
3 (A.R. 22.)

4   As previously discussed, the ALJ appears to have relied on
5 earlier medical reports from the middle of 2002 that related to a
6 time during which Plaintiff generally suffered lesser symptoms.
7 As previously noted, the reports from the following winter
8 reflect more serious symptoms interpreted as ongoing ischemia by
9 Plaintiff's treating physicians and, in their minds, requiring
10 further, invasive diagnostic procedures that Plaintiff was
11 frightened to undertake. Further, Dr. Ashraf in September 2005
12 relied on a test result dated September 6, 2005, which the ALJ
13 did not discuss. (A.R. 420.) The record does not support that
14 ALJ's reasoning that there was no change in objective clinical
15 findings.

16   The ALJ relied on inconsistencies between Plaintiff's daily
17 activities and the doctor's opinion. The only daily activities
18 noted by the ALJ in the decision were Plaintiff's having no
19 interest in anything and spending most of his time in his room.
20 (A.R. 20.) It does not appear that the ALJ adequately articulated
21 what daily activities were considered inconsistent with the
22 treating doctor's opinion.

23   Plaintiff testified that he had pain and could no longer
24 work. (A.R. 495.)

25   In an exertional daily activities questionnaire dated
26 September 2002, Plaintiff stated that he dressed, bathed, cooked,
27 and did laundry; he could walk a maximum of 300 yards, and it
28 took about fifteen to twenty minutes; he could climb fifteen

steps but experienced sweat, shortness of breath, and fatigue; he lifted only ten pounds three times a week; he carried a small shopping bag or a vacuum machine. He did his own grocery shopping once a week. It would take him several hours to vacuum, do laundry, and run the dishwasher. He could drive twenty miles maximum; outdoor activities he could do included fishing and watching football games; however, he could not do any activities then because they would often cause fatigue, weakness, pain, and dizziness. He had to nap three to four times a day. (A.R. 109-11.)

At the first hearing held in April 2003, he testified that his daily activities included performing his own personal hygiene, cooking, grocery shopping, doing laundry once or twice a month for one hour with a washer and dryer in his home, and sometimes visiting a friend; he could rest at home and come back to complete a task so he had no serious problems with that activity. He might be able to sweep, but he could not mop because his back would hurt him. If he tried to walk more than five minutes, he felt pain; he could stand ten minutes and sit about an hour, and could lift nothing more than five to ten pounds. Holding even light objects caused irritation and inability to control his hands; if he held a carton of milk, it would take a day before he was back to normal. He drove a car sometimes; since his surgery, the maximum distance he drove was forty or fifty miles. (A.R. 502-04, 507-08.)

At the second hearing held in November 2005, Plaintiff, who was then forty-nine years old, testified that his chest pain was experienced with any physical activity, light or heavy; even

1 standing for thirty minutes or any lifting or climbing stairs
2 caused severe heart pain requiring rest for two hours; walking
3 two blocks caused shortness of breath and severe pain; he could
4 stand for thirty minutes and sit for two hours; he could not lift
5 more than ten pounds without severe pain in the upper arm and
6 pectoral area. He lived with his wife and handled his own
7 personal hygiene; he sometimes watched TV while lying down; his
8 wife helped him with everything, including the cooking and
9 shopping. He drove when it was necessary; the longest he had
10 driven in the past six months was from Modesto to Stockton, and
11 he would stop and rest if the driving bothered him. (A.R. 526,
12 530, 532-34.)

13      The daily activities are substantially consistent with Dr.
14 Ashraf's opinions with respect to lifting (occasionally or rarely
15 ten pounds at most) and sitting (initially one hour at a time and
16 three hours total, then two hours) (A.R. 281, 418). Dr. Ashraf
17 initially reported an inability to stand or walk (A.R. 281), then
18 opined that Plaintiff could stand for thirty minutes (A.R. 418),
19 the same amount that Plaintiff himself stated was his limit. Dr.
20 Ashraf opined that Plaintiff could walk one block without rest or
21 severe pain. (A.R. 418.) Plaintiff did state that he could walk
22 five minutes and for 300 yards; however, by the second hearing he
23 stated that even walking two blocks brought on severe pain. Thus,
24 with respect to walking, the doctor's opinion was substantially
25 consistent. As to manipulative limitations, Plaintiff's testimony
26 and statements are not inconsistent with Ashraf's determination
27 that because Plaintiff's hands were affected, occasional grasping
28 and manipulation were permitted. (A.R. 281.) Further, the Court

41

does not see any daily activities as reported by Plaintiff that
were meaningfully inconsistent with the doctor's limitations.
Accordingly, the Court concludes that the record does not support
the ALJ's reasoning that there were inconsistencies between the
doctor's opinion and Plaintiff's daily activities, particularly
if reference to the development of Plaintiff's worsening symptoms
and declining abilities over time is considered.

The ALJ stated that the doctor was advocating on the
patient's behalf. (A.R. 22.) It is appropriate for an ALJ to
reject a physician's opinion where there is evidence that the
physician has become an advocate for the patient's position.
Matney on behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th
Cir. 1992) (physician's opinion rejected because of lack of
support by specific findings and physician's agreement to become
an advocate); Saelee v. Chater, 94 F.3d 520, 522-23 (9th Cir.
1996) (concluding that an ALJ had appropriately rejected a
doctor's opinion because the doctor's report was rendered solely
for the purposes of the administrative hearing, varied from the
doctor's own treatment notes, and was worded ambiguously in an
apparent attempt to assist the claimant in obtaining social
security benefits). The purpose for which an opinion is provided
is not a legitimate basis for evaluating the reliability of the
report; however, evidence of the circumstances under which a
report was obtained and its consistency with other records,
reports, or findings could form a legitimate basis for evaluating
the reliability of the report. The correct standard with respect
to an opinion's purpose is that in the absence of other evidence
to undermine the credibility of a medical report, the purpose for

42

1 which the report was obtained does not provide a legitimate basis

2 for rejecting it. <u>Reddick v. Chater</u>, 157 F.3d 715, 726 (9th Cir.

3 1998).

4      Thus, this factor is permitted only if there are other

5 specific improprieties in the report. Again, the foregoing

6 analysis reveals that there were not any other deficiencies.

7      Accordingly, it does not appear that the record supports

8 this reason or that this reason is legally adequate upon which to

9 base rejection of the opinion.

10      In conclusion, the ALJ's reasons for completely rejecting

11 the report of Dr. Ashraf are not supported by substantial

12 evidence in the record, are not sufficiently specific, and are

13 not legitimate.

14      When the VE was questioned regarding Dr. Ashraf's RFC's as

15 stated in the 2005 and 2002 assessments, the VE testified that it

16 would eliminate all jobs in the regional and national economy.

17 (A.R. 544-46.)

18           B. <u>Treating Physicians' Opinion re: Diabetes</u>

19      As previously noted in connection with Plaintiff's

20 credibility, the ALJ concluded that Plaintiff's blood sugar was

21 only slightly high and did not require a change of treatment.

22 (A.R. 20.)

23      Plaintiff argues that the ALJ erroneously rejected the

24 diagnoses of treating physicians with respect to Plaintiff's

25 having uncontrolled diabetes. Defendant relies upon the diabetes

26 as not lasting longer than one year. However, the ALJ did not

27 mention the longevity of the impairment. This Court is limited to

28 reviewing the findings of the ALJ and to reviewing the specific

1  facts and reasons that the ALJ asserts. <u>Connett v. Barnhart</u>, 340

2  F.3d 871, 874 (9th Cir. 2003). The district court cannot make

3  findings for the ALJ. <u>Id.</u>

4         Defendant points to the hemoglobin A1c readings and the

5  statement of one treating physician that Plaintiff was "probably

6  doing okay so far as control although he could be under a lot

7  better control," made by Dr. Castro or physician's assistant

8  Kitchell in November 2002. (A.R. 437.) This statement, when put

9  in context of the entire notation, does not support the ALJ's

10 conclusion that Plaintiff's diabetes was under control. Further,

11 as previously analyzed, it is inconsistent with the great weight

12 of evidence in the record, which reveals continued poor control

13 that required numerous adjustments of medications. There was no

14 record basis for disregarding the treating physicians' assessment

15 of Plaintiff's diabetes and uncontrolled sugar levels.

16       The Court notes that when asked if a person with insulin

17 dependency and low levels at the "50 range" became euphoric on an

18 unannounced basis daily and required a half hour of unscheduled

19 rest, the VE testified that all jobs would be eliminated. (A.R.

20 547.)

21       V. <u>Opinions of Consultative Examining Physicians</u>

22       Plaintiff challenges the adequacy of the ALJ's evaluation

23 and reasoning in connection with the opinions of two examining,

24 nontreating physicians.

25       In addressing Plaintiff's post-traumatic stress disorder

26 (PTSD), the ALJ noted that Plaintiff had neither sought nor

27 received treatment for PTSD or any other mental impairment. (A.R.

28 20.) The ALJ gave very little weight to the opinion of Dr.

1  Randall C. Epperson, a clinical neuropsychologist who performed a
2  qualified medical evaluation in connection with a worker's
3  compensation claim and who placed severe to moderate limitations
4  on the Plaintiff due to PTSD. (A.R. 20, 361-75.)

5               A. Dr. Sandhu's Opinion on Mental Impairment

6        Plaintiff argues that the ALJ erred in failing to include in
7  his RFC finding, and in a hypothetical question to the vocational
8  expert, Dr. Sandhu's limitations of only a fair ability to
9  complete a normal workday and of a tendency to become violent.
10 Plaintiff also argues that the ALJ's limitation of simple tasks
11 did not adequately account for the difficulty assessed to
12 Plaintiff in terms of the ability to complete a normal workday.

13       On November 18, 2004, Dr. Harsimrat Sandhu, a psychiatrist,
14 performed a comprehensive psychiatric evaluation of Plaintiff.
15 Plaintiff reported hypervigilance, poor sleep, and nightmares in
16 which someone was killing him. The nightmares began after
17 Plaintiff experienced numerous assaults by predominantly African-
18 American customers during his job as a convenience store clerk on
19 the night shift. Dr. Sandhu opined that Plaintiff had
20 posttraumatic stress disorder and a global assessment of
21 functioning (GAF) of 50. (A.R. 376-81.) Dr. Sandhu concluded that
22 Plaintiff would be able to perform work activities on a
23 consistent basis except that Plaintiff would have difficulty in
24 interacting with African-American coworkers or members of the
25 public because of his symptoms of PTSD; however, the doctor noted
26 that there were no African-American patients or staff in the
27 clinic for the doctor objectively to observe Plaintiff's
28 interactions. (A.R. 379.) He also stated that with respect to

1  workplace attendance, completing a normal workday, and dealing
2  with the usual stress in competitive work, Plaintiff's primary
3  difficulties would be in dealing with African-American colleagues
4  or public because Plaintiff reported that this significantly
5  triggered his anxiety and irritability; further, he might have
6  difficulty in responding appropriately and not becoming angry or
7  avoidant. (Id.)

8      The ALJ reviewed the major findings concerning the
9  examination and concluded:

10         I give somewhat greater weight to this exhibit,
           as it is more consistent with the claimant's failure
11         to mention his problem to his treating physicians. I
           do not believe that the claimant would be precluded
12         from all contact with African-Americans, however,
           as other treating and examining sources have not
13         notes (sic) any difficulty in this area.

14  (A.R. 21.)

15      The opinion of an examining physician is entitled to greater
16  weight than the opinion of a nonexamining physician. Lester v.
17  Chater, 81 F.3d 821, 830 (9th Cir. 1995). The uncontradicted
18  opinion of an examining physician may be rejected only if the
19  Commissioner provides clear and convincing reasons for rejecting
20  it. Id.; Edlund v. Massanari, 253 F.3d 1152, 1158-59 (9th Cir.
21  2001). The opinion of a nontreating but examining physician
22  constitutes substantial evidence, and may even be relied upon
23  instead of the contradictory opinion of a treating physician,
24  where it is based on independent clinical findings that differ
25  from those of the treating physician. Andrews v. Shalala, 53 F.3d
26  1035, 1041 (9th Cir. 1995). The definition of independent clinical
27  findings has recently been clarified in this circuit:

28      Independent clinical can be either 1) diagnoses

1    that differ from those offered by another physician
2    and that are supported by substantial evidence,
     see <u>Allen</u>, 749 F.2d at 579, or (2) findings based
3    on objective medical tests that the treating physician
     has not herself considered, see <u>Andrews</u>, 53 F.3d at 1041.

4  <u>Orn v. Astrue</u>, – F.3d –, 2007 WL 2034287, *5 (9th Cir. 2007).

5       The opinion of a nontreating, nonexamining physician can

6  amount to substantial evidence as long as it is supported by

7  other evidence in the record, such as the opinions of other

8  examining and consulting physicians, which are in turn based on

9  independent clinical findings. <u>Andrews v. Shalala</u>, 53 F.3d at

10 1041. An ALJ can reject the opinion of an examining physician and

11 adopt the contradictory opinion of a nonexamining physician only

12 for specific and legitimate reasons that are supported by

13 substantial evidence in the record. <u>Moore v. Commissioner of</u>

14 <u>Social Security Administration</u>, 278 F.3d 920, 925 (9th Cir. 2002)

15 (quoting <u>Lester v. Chater</u>, 81 F.3d at 830-31).

16      Here, some of the limitations imposed by Dr. Sandhu were

17 conditional in the sense that they would not arise except during

18 interaction with African-American people. Insofar as the ALJ put

19 weight on the report, it appears that it was because the ALJ

20 considered it to be consistent with the medical record, which the

21 ALJ interpreted as revealing an absence of complaints even to

22 treating doctors from Plaintiff with respect to his PTSD

23 symptoms. Plaintiff does not challenge the ALJ's putting weight

24 on the report.

25      Here, the ALJ's affirmatively stated reasoning for rejecting

26 the portion of the limitations relating to interaction with

27 African-Americans was specific; he relied on the inconsistency of

28 this limitation with the medical record, namely, the lack of any

1  mention of this difficulty in this specific area by other
2  treating and examining sources. (A.R. 21.)

3      First, the factual assumption underlying the ALJ's weighting
4  of the opinion in general, namely, that Plaintiff did not mention
5  his PTSD to his treating physicians, is not supported by the
6  record. Dr. Epperson reported that Plaintiff reported to Dr.
7  Epperson that his cardiologist suggested that he see a
8  psychologist or psychiatrist in 2002, but Plaintiff had no
9  insurance coverage and could not seek treatment. (A.R. 364.)
10 Thus, the record does reflect that Plaintiff had discussed his
11 mental impairment or condition with his cardiologist; however, it
12 also reflects that Plaintiff lacked the means (insurance) to
13 follow the cardiologist's recommendation.

14     Further, the absence of a notation regarding PTSD in the
15 treating physicians' notes does not necessarily have much
16 probative force. It has recently been noted that the primary
17 function of medical records is to promote communication and
18 recordkeeping for health care personnel, not to provide evidence
19 for disability determinations; thus, even chronic conditions that
20 are the subject of treatment need not necessarily be mentioned
21 consistently. <u>Orn v. Astrue</u>, - F.3d -, 2007 WL 2034287, *7 (9th
22 Cir. 2007).

23     In any event, it appears that the ALJ did not consider
24 Plaintiff's inability to pay. Thus, it was inappropriate to draw
25 an inference as to the severity or functional effects of
26 Plaintiff's mental impairment merely from Plaintiff's failing to
27 seek or obtain treatment for a mental impairment. <u>See</u>, <u>Orn v.
28 Astrue</u>, - F.3d -, 2007 WL 2034287, *12 (9th Cir. 2007) (holding

1  that an adverse finding based on gaps in medical treatment is
2  appropriate only if the ALJ has first considered any explanations
3  that the claimant may provide, or other information in the case
4  record, that may explain infrequent or irregular medical visits
5  or failure to seek medical treatment, including inability to pay,
6  and further, that an adverse finding is inappropriate if the
7  claimant lacked insurance and thus could not afford the treatment
8  in question).

9      Further, it is arguably reasonable to assume that Plaintiff
10 would have mentioned his PTSD symptoms to a cardiologist, who was
11 concerned with stress, but it is questionable whether Plaintiff
12 would necessarily have mentioned his PTSD symptoms to the doctors
13 who monitored Plaintiff's diabetes or liver function. In Widmark
14 v. Barnhart, 454 F.3d 1063 (9th Cir. 2006), the court found
15 unreasonable, and thus an insufficient explanation for rejecting
16 an orthopedist's opinion, an ALJ's reliance on 1) the failure of
17 a claimant to mention his thumb injury in connection with his
18 claim for back and neck pain, and 2) the lack of any other expert
19 opinion in the record regarding the thumb. The ALJ had rejected
20 an orthopedist's opinion because no other physician had cited any
21 significant restrictions relating to thumb impairment. The Court
22 noted that this merely stated a fact and did not explain,
23 specifically and legitimately or otherwise, how that fact lead to
24 the conclusion that the doctor's evaluation should be
25 disregarded. Id. p. 1067. The court then examined whether there
26 was substantial evidence in the record to support the reason. The
27 court stated:

28      Nor can this conclusion be supported by substantial

49

evidence in the record. To reject Dr. Greenleaf's
thumb opinion based on the absence of another thumb
opinion in the record, the ALJ would have had to infer
from this absence that Widmark's other examining
physicians did not comment on any restriction
in his ability to do fine manipulation because
none existed. This inference would, in turn, require
the further inference that it would be reasonable
to expect Widmark's examining physicians to have
tested the range of motion in his thumb. But such an
inference cannot reasonably be drawn from the
relevant facts in the record. Those facts are that
Widmark's alleged basis for his disability claim
was severe neck and back pain and that the reports
of Widmark's other examining physicians all indicate
he visited them for his neck and back, either to be
examined for the purpose of evaluating his disability
claim or for pain management. It is reasonable, based
on these facts, to expect that Widmark's examining
physicians focused their attention on the subject
of his complaint, i.e., his neck and back. But
just as no reasonable person would expect a podiatrist
seeing a patient who complains of foot problems to
thoroughly examine the full range of that patient's
hearing, it is unreasonable to expect Widmark's
examining physicians undertook a thorough range
of motion evaluation of Widmark's right thumb.
That Dr. Greenleaf, an orthopedist, offered the thumb
opinion here does not undercut this conclusion.
In offering his assessment of Widmark's limited
ability to use his thumb, Dr. Greenleaf simply
exceeded the reasonable expectations of what
an orthopedist charged with evaluating a disability
applicant's claims of debilitating neck and back pain
would cover during a routine examination. Because
the ALJ's second reason for rejecting Dr. Greenleaf's
thumb opinion rests on an inference that cannot be
reasonably drawn from the record, substantial evidence
does not support it. *See* <u>Batson</u>, 359 F.3d at 1193.
(Footnotes omitted.)

<u>Widmark</u>, 454 F.3d at 1067-68.

Further, in <u>Widmark</u>, the court rejected as unreasonable

reliance on Plaintiff's previous failure to mention his thumb

condition or resulting limitations in connection with his back

and neck disability claim. Where a claim of disability is

consistently made with respect to neck and back pain, it is

unreasonable to infer solely from a failure to mention an injured

1  thumb in a benefits application that the thumb did not hinder an
2  ability to do fine manipulation. Widmark, 454 F.3d at 1068
3  (noting that this was especially true where the claimant was not
4  represented by counsel and the ALJ had an affirmative duty to
5  develop the record and yet failed to question the applicant about
6  his thumb impairment or seek additional evidence to fill the gap
7  in the record; in such circumstances, an unrepresented claimant
8  cannot be expected to realize that a thumb injury was relevant to
9  an RFC determination and thus critical to mention, and it is the
10 ALJ who is in the better position to know the relevance of the
11 information and to discover and verify it).

12      Here, although Plaintiff had counsel, Plaintiff suffered a
13 mental condition that under some circumstances made him avoidant,
14 and thus it is even more inappropriate to rely on the failure to
15 communicate regarding this difficulty with respect to
16 practitioners who treated Plaintiff for physical ailments.

17      To the extent that this reason remains viable in light of
18 the lack of record support, then pursuant to the reasoning of
19 Widmark, Plaintiff's failure to mention his mental condition to
20 his treating and examining doctors (with the exception of the
21 doctors charged with performing a mental evaluation or treatment
22 relating to symptoms of stress that induced cardiac symptoms)
23 should not be a legitimate reason. Plaintiff's doctors, with the
24 exception of Epperson and Sandhu, were not mental health
25 practitioners, and it would not be reasonable to assume that they
26 would inquire or opine regarding mental conditions.

27      Defendant argues that the limitation regarding not working
28 around African-Americans was unsupported by objective evidence in

51

1  the record; it was only based on Plaintiff's subjective complaint

2  and not on objective observation; thus, it could legitimately be

3  rejected.

4       First, the ALJ's credibility findings have been found to

5  have been unsupported and inadequate. Thus, in the absence of the

6  statement of additional reasons for specific, negative

7  credibility findings, the fact that the genesis of a limitation

8  is a subjective phenomenon is not a supported reason. Further,

9  although no other medical practitioner expressly talked about

10 Plaintiff's working around African-American people, there was

11 abundant objective evidence of Plaintiff's pertinent mental

12 condition as reported by examining consultant Dr. Epperson in

13 December 2003, including a Beck Anxiety Inventory score of 34,

14 which is in the severe range and indicates subjective feelings of

15 anxiety (inability to relax, nervousness, fear of losing control)

16 as well as somatic correlates of numbness, tingling, sweating,

17 flushing, shakiness, dizziness, lightheadedness, heart racing,

18 feelings of choking, tremor, difficulty breathing, and GI

19 distress; a State-Trait Anxiety Inventory showing an anxiety

20 level at the 94th percentile for all adult males; and an

21 Occupational Stress Inventory-Revised that reflected moderate

22 stress for handling his mood at work, interpersonal strain with

23 frequent quarrels and tensions with others, and physical strain

24 with regard to concern about health, as well as higher stress

25 with respect to an unreasonable work load unsupported by needed

26 resources, difficulty concentrating, and reaction to the work

27 environment; and a Detailed Assessment of Post Traumatic Stress

28 (DAPS), which revealed major elevations of 94 on re-experiencing

of the trauma, 91 for avoidance of ideas or things reminding him of the traumas, and 81 (three standard deviations above the mean) for autonomic nervous system hyperarousal such as restlessness, insomnia, startle reflex, and muscular tension, with an overall summary PTSD total score of 90, which confirmed that PTSD was a significant problem. (A.R. 369-71.) Dr. Epperson noted that Plaintiff could not visit convenience stores; if he saw Black people in the community, he felt nervous and tried to avoid them and other stimuli involving Black violence, such as movies or television; this was typical PTSD avoidance behavior. (A.R. 364.) Dr. Epperson opined that Plaintiff should be given antidepressant and anti-anxiety medications, with a course of outpatient therapy to reduce PTSD symptomotology, which would probably require 30-40 sessions because it had become entrenched over the two years that preceded Dr. Epperson's examination. (A.R. 374.)

These test results, as reported and interpreted by Dr. Epperson, constitute an objective basis that supports the opinion that Plaintiff would have difficulty interacting with African-American people, who were the precipitating agents of the trauma during Plaintiff's assaults during his employment as a convenience store clerk working the night shift.

Accordingly, the record does not support the ALJ's statement that other examining sources had not noted any difficulty in Plaintiff's having contact with African-Americans. Further, the record does not support the conclusion that Plaintiff never reported his mental symptoms to any of his practitioners.

Therefore, the ALJ failed to articulate adequate reasons for rejecting the limiting portion of Dr. Sandhu's opinion, which

1  included inability to perform work activities on a consistent
2  basis if interacting with African American colleagues or members
3  of the public, as well as attending in the workplace, completing
4  a normal workday, and dealing with the usual stress in
5  competitive work under like circumstances, which would trigger
6  his anxiety and irritability and further might result in
7  difficulty responding appropriately and not becoming angry or
8  avoidant.

9      Plaintiff also argues that the ALJ's limitation of simple
10  tasks did not adequately account for the difficulty assessed to
11  Plaintiff in terms of the ability to complete a normal workday.
12  Plaintiff is correct that a limitation to simple tasks does not
13  address the difficulty in interacting with African Americans.
14  Further, the Court notes that when the VE was questioned
15  regarding Dr. Sandhu's limitations, the VE testified that all
16  jobs would be eroded if such limitations applied. (A.R. 547-48.)

17          B. Opinion of Consulting Examiner Dr. Aboughannam

18      Plaintiff argues that the ALJ failed to state adequate
19  reasons for discounting the opinion of Dr. Aboughannam.

20      Internal medicine specialist Dr. Aboughannam opined after
21  examining Plaintiff on October 28, 2004, that Plaintiff could
22  lift and carry twenty-five pounds frequently and fifty pounds
23  occasionally, and stand and walk two hours in an eight-hour
24  workday with unlimited sitting but with some limitation on
25  feeling with his hands because of a decrease in light touch
26  sensation in both legs and in his fingertips. (A.R. 386.) The ALJ
27  stated:

28      I give great weight to this opinion on the whole, but

less weight to the manipulative restrictions. This
restriction is only supported by the claimant's
subjective reports, which I believe are not fully
credible. The claimant's blood sugar levels have
been reasonably stable and his treating physician
has not noted any neuropathy.

(A.R. 21.)

The ALJ's credibility findings have previously been analyzed
and are inadequate. The additional reason stated, namely, that
blood sugar levels had been reasonably stable, and the treating
physician had not noted any neuropathy, are references to the
status of the medical record and the lack of objective support
for Plaintiff's claimed manipulative limitations. A claimant's
statements will not be rejected solely because unsubstantiated by
the available objective medical evidence. 20 C.F.R. §§
404.1529(c)(2); 416.929(c)(2).

Therefore, to the extent that Plaintiff's reports were
subjective, it is possible to conclude that no legitimate basis
for rejecting the opinion has been stated.

However, carrying the analysis forward, the Court notes that
the stated reasons are not supported by substantial evidence in
the record. The doctor noted that his examination of Plaintiff
revealed some decrease in light touch sensation and bilateral
fingertips in Plaintiff's hands. (A.R. 385.) This evidence
qualifies as objective medical evidence. For purposes of benefits
determinations, "objective medical evidence" includes medical
signs and laboratory findings as defined in 20 C.F.R. §§
404.1528(b) and (c) and 416.928(b) and (c). 20 C.F.R. §§
404.1529(a), 416.929(a). Medical signs are anatomical,
physiological, or psychological abnormalities which can be

observed apart from symptoms; signs must be shown by medically
acceptable clinical diagnostic techniques. Id. at §§ 404.1528(b),
416.928(b). Signs are shown by observable facts that can be
medically described and evaluated. Professional skill and
judgment, and not merely the noting and reporting of a person's
statements, are required to evaluate the presence and severity of
signs. Id. The third category of evidence, "laboratory findings,"
are anatomical, physiological, or psychological phenomena which
can be shown by the use of medically acceptable laboratory
diagnostic techniques, including things such as chemical tests,
electrophysiological studies, roentgenological studies, and
psychological tests. 20 C.F.R. § 404.1528(b). "Objective medical
evidence" refers to any evidence that an examining doctor can
discover and substantiate; it is not limited to concrete
physiological data, but includes all evidence that is amenable to
external testing. Luna v. Bowen, 834 F.2d 161, 162 (10th Cir.
1987). Subjective evidence, conversely, consists of statements by
a claimant or other witnesses on his behalf that are not based on
information which an impartial medical expert can evaluate either
from examining the claimant himself or herself, or from
evaluating the claimant's test results or examination reports; it
is evidence that the decision maker must evaluate solely on the
basis of the credibility of the witness. Id.

The ALJ's reliance on Plaintiff's stable blood sugar levels
(A.R. 21) was not supported by substantial evidence; Plaintiff's
history of unstable and uncontrolled blood sugar levels has
previously been discussed.

The only remaining factor referred to by the ALJ for giving

less weight to the manipulative restrictions was that Plaintiff's treating physician had not noted that Plaintiff had any neuropathy. (A.R. 21.) The probative value of this reason is relatively weak because the consulting doctor did not diagnose neuropathy, but rather only "possible neuropathy." It is not clear that treating physicians may reasonably be expected to note possible conditions that are not diagnosed.

Neuropathy is defined generally as a functional disturbance or pathological change in the peripheral nervous system. Dorland's Medical Dictionary (28th ed. 1994) p. 1132. Neither party has cited to a place in the record where the treating physician has diagnosed Plaintiff with actual or possible neuropathy. However, even Plaintiff's treating cardiologist noted symptoms that could be associated with neuropathy, including effect on Plaintiff's hands and feet, which apparently prompted his limitation to only occasional simple grasping and fine manipulation, pushing, and pulling, and only frequent (not continuous) reaching, handling, feeling, pushing/pulling, hearing, and speaking. (A.R. 281-82.)

In summary, most of the ALJ's reasons for giving less weight to the manipulative limitations were not legitimate or supported by substantial evidence in the record. To the extent that the record does support the reasoning, it is of limited probative value because the consulting examiner never actually diagnosed neuropathy, but only noted that it was a possibility.

Further, Plaintiff argues that the ALJ failed to adopt, and failed to state reasons for not adopting, Dr. Aboughannam's functional limitation of standing and walking for only two hours

1  out of an eight-hour day because of his diabetes, coronary artery
2  disease, fatigue, and possible neuropathy. (A.R. 385.)

3       Review of the ALJ's opinion reflects no mention of this
4  limitation and no statement of reasons for rejecting Dr.
5  Aboughannam's opinion in this regard. The reasoning regarding
6  possible neuropathy has been shown to be questionable and does
7  not address the opinion that the functional limitations assessed
8  by the doctor were based on a combination of all of Plaintiff's
9  then-existing impairments, and not just a mention of possible
10 neuropathy.

11      A fundamental principle of review operative in this case is
12 that this Court is limited to reviewing the findings of the ALJ
13 and to reviewing the specific facts and reasons that the ALJ
14 asserts. Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003)
15 (holding in part that the mere presence of evidence in the record
16 that would support an ALJ's conclusions, in the absence of the
17 ALJ's discussion thereof, was insufficient). An ALJ need not
18 discuss evidence that is neither significant nor probative.
19 Howard v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003). However,
20 with respect to significant, probative evidence, such as an
21 expert opinion, an ALJ must explicitly reject the opinion and set
22 forth specific reasons of the requisite force for doing so.
23 Nguyen v. Chater, 100 F.3d 1462, 1464 (9th Cir. 1996) (holding
24 that the ALJ erred in failing to explicitly reject an opinion and
25 set forth specific, legitimate reasons for crediting another
26 opinion). The district court cannot make findings for the ALJ.
27 Id. A district court cannot affirm the judgment of an agency on a
28 ground the agency did not invoke in making its decision. Pinto v.

1  Massanari, 249 F.3d 840, 847-48 (9th Cir. 2001). Even application

2  of the harmless error rule is circumscribed by this basic

3  requirement. It has recently been held that where an error

4  consists of an ALJ's failure to discuss probative evidence

5  properly, a reviewing court cannot consider the error harmless

6  unless it can confidently conclude that no reasonable ALJ, when

7  fully crediting the evidence, could have reached a different

8  disability determination. Stout v. Commissioner of Social

9  Security, 454 F.3d 1050 (9th Cir. 2006) (concluding that an ALJ's

10 failure to evaluate and state reasons for evaluating lay

11 testimony was not harmless). The authorities thus reflect the

12 fundamental principle that the ALJ's opinion must contain

13 sufficient findings to permit intelligent judicial review,

14 particularly with respect to significant probative evidence.

15 Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984).

16     Here, the opinion of Dr. Aboughannam was clearly

17 significantly probative to the ALJ, who expressly stated that he

18 gave great weight to the opinion on the whole, and less weight

19 only regarding the manipulative restrictions. (A.R. 21.) It was

20 therefore erroneous for the ALJ apparently to reject the two-hour

21 limitation placed by Dr. Aboughannam on Plaintiff's standing and

22 walking in an eight-hour workday, which was supported by the

23 doctor's independent findings concerning Plaintiff's coronary

24 artery disease, diabetes mellitus, and fatigue, without stating

25 specific and legitimate reasons therefor. (A.R. 385, 21.)

26     The VE testified that an inability to stand less than six

27 hours and fifteen minutes would eliminate the medium jobs and all

28 light jobs except for office helper (A.R. 542-43).

VI. <u>Opinions of Nontreating, Nonexamining Medical Consultants</u>

Plaintiff also attacks as inadequate the reasons given by the ALJ for giving less weight to the findings of one medical consultant and instead relying on the less restrictive RFC assessment of another consultant. The ALJ stated:

> The Disability Determination Service ("DDS") consulting physician concluded that the claimant could lift 50 pounds occasionally and 25 pounds frequently. He can sit, stand and/or walk for about six hours each in an eight-hour workday (Exhibit 9f). Although a second DDS physician concluded that the claimant could perform a full range of light work, I give less weight to this exhibit (Exhibit 11F). The second doctor did not write any justification for his conclusion, and I am unwilling to speculate as to why he believed that the claimant's condition was other than what was previously determined. Thus, I give greater weight to the first doctor's assessment, although I do believe that some nonexertional limitations are in order, given the claimant's diabetes and post-traumatic stress disorder.

(A.R. 21.)

The first assessment in chronological terms was the RFC assessment of state medical consultant Thien Nguyen dated September 12, 2001 (A.R. 216-23), in which Dr. Nguyen opined that Plaintiff could perform medium work (lift and carry fifty pounds occasionally and twenty-five pounds frequently, stand and sit about six hours with no other limitations).[3] Dr. Nguyen stated

---

[3] Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. §§ 404.1567 (DIS), 416.967(c) (SSI).

A full range of medium work requires standing or walking, off and on, for a total of approximately six hours in an eight-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to twenty-five pounds. Soc. Sec. Ruling 83-10 at 5. As in light work, sitting may occur intermittently during the remaining time. <u>Id.</u>  Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as

60

that there was a treating or examining source statement, but it
was not different from his findings; nevertheless, he explained
why the source/s's conclusions were not supported by the evidence
in the file, although it is not totally legible: he noted that
three months after the surgery Plaintiff did not complain of
chest pain, and he had no other symptoms of heart problems. (A.R.
22.) In additional comments, he noted the reports of treatment
and consultative exams from May 2001 through August 2001. (Id.)

The second opinion was from a state medical consultant whose
name is illegible but who rendered on November 1, 2002, an
evaluation of Plaintiff's coronary artery disease and concluded
essentially that Plaintiff could perform light work[4] (lifting and
carrying twenty pounds occasionally and ten pounds frequently)

use of the hands and arms. Further, in most medium jobs, being on one's feet
is critical, and being able to do frequent lifting or carrying of objects
weighing up to twenty-five pounds is often more critical than being able to
lift up to fifty pounds at a time. Id.

[4] Light work is defined by 20 C.F.R. § 404.1567(b) (DIS) and 20 C.F.R. §
416.967(b)(SSI) as involving lifting no more than 20 pounds at a time with
frequent lifting or carrying of objects weighing up to 10 pounds. Even though
the weight lifted may be very little, a job is in this category when it
requires a good deal of walking or standing, or when it involves sitting most
of the time with some pushing and pulling of arm or leg controls. To be
considered capable of performing a full or wide range of light work, you must
have the ability to do substantially all of these activities. If someone can
do light work, we determine that he or she can also do sedentary work, unless
there are additional limiting factors such as loss of fine dexterity or
inability to sit for long periods of time.
    To be capable of performing a full range of work, one must be capable of
performing all or substantially all occupations existing at an exertional
level. Soc. Sec. Ruling 83-10 at 5. "Frequent" means occurring from one-third
to two-thirds of the time. Id. Because frequent lifting or carrying requires
being on one's feet up to two-thirds of a workday, the full range of light
work requires standing or walking, off and on, for a total of approximately
six hours of an eight-hour workday; sitting may occur intermittently during
the remaining time. Id. Further, the lifting requirement for the majority of
light jobs can be accomplished with occasional, rather than frequent,
stooping. Id.
    Many unskilled light jobs are performed primarily in one location, with
the ability to stand being more critical than the ability to walk. Id. They
require use of arms and hands to grasp and to hold and turn objects, and they
generally do not require use of the fingers for fine activities to the extent
required in much sedentary work. Id.

1 with no other limitations. (A.R. 249-56.)

2      The ALJ's reason, namely, that no reasons were stated for
3 the opinion, is supported by evidence. However, opinion related
4 to Plaintiff's coronary artery disease and diabetes mellitus, and
5 the lack of symptoms at that time, early September 2001. (A.R.
6 216, 222-23.) The bulk of the medical evidence, however, as
7 discussed hereinabove, supports a finding that Plaintiff's
8 coronary artery disease was progressively worsening, and his
9 poorly controlled symptoms of diabetes mellitus continued to
10 require modifications in treatment. Indeed, the ALJ himself
11 concluded that he gave less weight to medical records before May
12 20, 2002, because Plaintiff was then able to work at the
13 substantial gainful activity level despite his heart condition
14 and his psychiatric condition before that date. (A.R. 21.) Thus,
15 both the reasons given by the consultant for the opinion and the
16 ALJ's apparent reasons for crediting the opinion were not
17 particularly probative.

18      Further, as Plaintiff notes, this opinion was inconsistent
19 with the opinion of his treating cardiologist, which, as was
20 earlier discussed, was not justifiably rejected.

21      VII. <u>Sufficiency of Evidence to Support Vocational
           Findings</u>

22
23      Plaintiff argues that at step five, the vocational testimony
24 was inadequate to support the finding that given his RFC and
25 vocational factors, Plaintiff could perform jobs other than his
26 past relevant work that existed in significant numbers in the
27 national economy. <u>See</u>, 20 C.F.R. §§ 1560, 416.960; <u>Tackett v.
28 Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999) (setting forth in

1  detail the five steps of analysis of disability).

2      The Commissioner may carry its burden of showing ability to
3  do other work by eliciting the testimony of a vocational expert
4  (VE) in response to a hypothetical that sets out all the
5  limitations and restrictions of the claimant that are supported
6  by the record. Andrews v. Shalala, 53 F.3d 1035, 1044 (9th Cir.
7  1995). A hypothetical question posed to a vocational expert (VE)
8  must include all impairments supported by substantial evidence.
9  Osenbrock v. Apfel, 240 F.3d 1157, 1164-65 (9th Cir. 2001).
10 Reliance on a hypothetical that fails to include all accepted
11 limitations is insufficient to carry the agency's burden of
12 proving ability to engage in alternative work. Andrews v.
13 Shalala, 53 F.3d 1035, 1044 (9th Cir. 1995) (remanding case to the
14 agency to determine vocational ability based on a hypothetical
15 that accurately reflected mental RFC, including moderate
16 limitations in ability to understand, remember, and carry out
17 detailed instructions, as well as work with others without
18 distraction, respond appropriately to work changes, and set goals
19 or plans independently of others).

20     Based on the less restrictive RFC found by the ALJ, the ALJ
21 concluded that Plaintiff could not perform his past relevant
22 work. (A.R. 22.) The ALJ found that Plaintiff had the RFC for
23 lifting and carrying fifty pounds occasionally and twenty-five
24 pounds frequently, standing or walking for at least six hours in
25 combination in an eight-hour workday, sitting without limit when
26 not required to stand or walk; no climbing ladders or scaffolding
27 but can include climbing stairs; should not work at heights;
28 better suited for jobs requiring relatively simple instructions

1  and relatively restricted contact with the public and coworkers,
2  and can work in the presence of others but cannot be part of a
3  work team or cooperative work process. (A.R. 22.) These are the
4  limitations in the question propounded to the VE. (A.R. 540-41.)

5  As Plaintiff argues, in light of the foregoing analysis, the
6  hypothetical questions propounded to the VE were inadequate or do
7  not support the ALJ's findings. Some of the actual symptoms as
8  testified to by Plaintiff were never directly propounded to the
9  VE with an articulation of precise functional limitations
10 attending them, such as chest pain, fatigue, lightheadedness,
11 weakness, inability to concentrate, and side-effects of
12 medications (fatigue, irritation, sores in the mouth, aching
13 muscles).[5] Others, such as the limitations of the treating
14 cardiologist, euphoria resulting from insulin problems, inability
15 to maintain work various work functions while working around
16 African Americans, standing for only two hours, were propounded
17 to the VE, who testified that with such a limited RFC, there
18 would be no jobs. (A.R. 544-48.)

19 In addition, Plaintiff correctly argues that the
20 hypothetical questions should have included other limitations
21 expressly found by the ALJ, including mild restrictions of his
22 activities of daily living, moderate difficulties maintaining
23 social functioning, and moderate deficiencies of concentration,

24

25

26

27

28

---

[5] The Court notes that at the earlier hearing, the VE opined that Plaintiff's complaints of fatigue, chest pain after walking five minutes, standing more than ten, sitting for an hour, lifting no more than ten pounds, numbness in the hands, lack of control of the hands, and back pain (A.R. 504-06, 508) would result in no jobs (A.R. 513-14).

1 persistence, or pace. (A.R. 19.)[6]

2    Defendant argues that the hypothetical question adequately
3 reflected the limitations found by the ALJ, which were in turn
4 supported by substantial evidence in the form of Dr. Sandhu's
5 conclusions that Plaintiff remained able to perform not only
6 simple and repetitive tasks, but also detailed and complex tasks
7 and that he would have difficulty in some situations (in
8 interacting with African American coworkers or members of the
9 public) in accepting instructions from supervisors and
10 interacting with coworkers. (A.R. 379, 541.) The preceding
11 analysis should suffice to explain the Court's rejection of this
12 contention.

13    The questions to the VE did not reflect limitations
14 expressly found by the ALJ, including the moderate difficulties
15 in maintaining social functioning and moderate deficiencies of
16 concentration, persistence, or pace. The ALJ did find that he
17 could perform a significant range of medium work with
18 nonexertional limitations. The limitation in the hypothetical to
19 Plaintiff's being better suited for jobs involving relatively
20 simple instructions (A.R. 540) did not address Plaintiff's
21 moderate difficulties of pace. The limitation of being better
22 suited for jobs involving relatively restricted contact with the
23 public and coworkers did not address the limitation of inability
24 to work with African American coworkers or members of the public.

25    In summary, it appears that the hypothetical questions to

26 ─────────────────

27    [6] The Court notes, however, that the ALJ found that Plaintiff retained
the understanding and memory, sustained concentration and persistence, social
28 interaction, and adaptation skills necessary to engage in substantial gainful
activity. (A.R. 19.)

1  the VE thus did not even include the limitations expressly found
2  by the ALJ to exist, let alone those limitations that were
3  inadequately rejected.

4       Plaintiff finally argues that the VE never testified that
5  Plaintiff could perform the light exertional jobs listed by the
6  ALJ. The ALJ listed light jobs of office helper, packing line
7  assembler, and small parts assembly worker. (A.R. 23.) The VE did
8  appear to testify to the presence of such jobs for Plaintiff
9  given assumptions of RFC. (A.R. 541-42.)

10      VIII. <u>Remedy</u>

11      The Court must determine the appropriate remedy in light of
12  the numerous errors found to have been committed by the ALJ.

13      A district court is authorized to affirm, modify, or reverse
14  a decision of the Commissioner of Social Security, with or
15  without remanding the cause for a rehearing. 42 U.S.C. § 405(g).
16  The decision whether to remand a matter pursuant to sentence four
17  of § 405(g) or to order immediate payment of benefits is within
18  the discretion of the district court. <u>Harman v. Apfel</u>, 211 F.3d
19  1172, 1178 (9th Cir. 2000).

20      It is established that where the Commissioner fails to
21  provide adequate reasons for rejecting the opinion of a treating
22  or examining physician, the Court is to credit that opinion as a
23  matter of law, even where there is evidence in the record upon
24  which the ALJ legitimately could have rejected the expert
25  opinion, where there are no outstanding issues that must be
26  resolved before a determination of disability can be made, and it
27  is clear from the record that the ALJ would be required to find
28  the claimant disabled were such evidence credited, such as where

1  there is testimony from a vocational expert that the limitations

2  would render the claimant unable to engage in any work. Harman v.

3  Apfel, 211 F.3d 1172, 1178-80 (9th Cir. 2000).

4      Further, where the ALJ has failed to provide legally

5  sufficient reasons for rejecting an applicant's testimony, and

6  there are no outstanding issues that must be resolved before a

7  determination of disability can be made, and it is clear from the

8  record that the ALJ would be required to find the clamant

9  disabled if his testimony were credited, then remand for

10 additional proceedings would be inappropriate. Moisa v. Barnhart,

11 367 F.3d 882, 886-87 (9th Cir. 2004).

12     Here, the ALJ failed to provide legally adequate reasons for

13 rejecting the treating physicians' opinions, consulting

14 examiner's opinions, and the Plaintiff's allegations regarding

15 subjective symptoms. There are no outstanding issues to be

16 resolved, and it is clear from the record that the ALJ would be

17 required to find the claimant disabled if the opinions and

18 allegations were credited. Thus, there is no purpose to be served

19 by a remand, and the Commissioner should be ordered directly and

20 forthwith to award Plaintiff benefits as prayed from May 20,

21 2002, onward.

22     IX. Disposition

23     Accordingly, it IS ORDERED that

24     1) Plaintiff's Social Security Complaint IS GRANTED; and

25     2) The decision of the Commissioner denying Plaintiff's

26 application for benefits IS REVERSED; and

27     3) The matter IS REMANDED to the Commissioner of Social

28 Security with directions to award forthwith benefits from May 20,

1   2002, forward; and

2        4) Judgment BE ENTERED for Plaintiff Roshdy M. Attia and

3   against Defendant Michael J. Astrue.

4

5   IT IS SO ORDERED.

6   **Dated:   September 21, 2007**            /s/ **Sandra M. Snyder**
                                        UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28